Docket No. 84686–Agenda 8–September 1999.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. PARIS D. SIMS, Appellant.

Opinion filed June 15, 2000.

JUSTICE McMORROW delivered the opinion of the court:

Following a jury trial in the circuit court of St. Clair County, the defendant, Paris D. Sims, was convicted of first degree murder, attempted first degree murder and armed robbery. At a separate sentencing hearing, the same jury found defendant eligible for the death penalty. The jury also found that there were no mitigating circumstances sufficient to preclude imposition of that sentence. Defendant was sentenced to death for the murder and to consecutive 30-year terms of imprisonment for the remaining offenses. Defendant’s death sentence has been stayed pending direct review by this court. Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d Rs. 603, 609(a). For the reasons that follow, we affirm defendant’s convictions and sentences.

BACKGROUND

Testimony at trial established the following facts. On the morning of October 24, 1994, at approximately 4 a.m., police officers in Belleville, Illinois, received a call stating that a man had been seen, covered in blood, running down the street in a Belleville trailer park. When the officers responding to the call reached the trailer park, they discovered this man, lying in a fetal position on the ground near the trailers. The man was bleeding from the head and face and was incoherent. Officers also discovered, in the bedroom of one of the trailers, the dead body of 17-year-old JoAna Bollinger.
(footnote: 1) The man found injured on the ground, police later learned, was JoAna Bollinger’s 17-year-old husband, Jacob Bollinger.

At trial, Jacob testified about the events which took place during the evening hours of October 23 and early morning hours of October 24. Jacob told the jury that on the evening of October 23, at about 9:30 or 10 p.m., he and some friends left Belleville and drove to the nearby town of Waterloo to pick up a pet snake. Jacob explained that he had an interest in reptiles and that the snake was a present from his wife, JoAna, for his upcoming birthday. Jacob acknowledged that, while he was in Waterloo, he smoked marijuana. He stated, however, that despite smoking the marijuana, he remained aware of what was going on around him. Jacob returned home from Waterloo, alone, at about 11:30 p.m.

Jacob testified that when he arrived home, he began cleaning the aquarium in which the pet snake was kept. JoAna was awake and sitting on the couch in the front portion of the Bollingers’ trailer, which consisted of a combination living room and kitchen area. The Bollingers’ infant daughter was asleep in her bedroom, just to the rear of the living room. After Jacob finished cleaning the aquarium, he and JoAna went to their bedroom at the back end of the trailer and began to engage in sexual intercourse. Shortly thereafter, they heard someone knocking on their front door. The Bollingers tried to ignore the knocking, but after it had continued for about 10 minutes, Jacob decided to answer the door. He put on some sweatpants and returned to the living room.

Jacob testified that when he opened the front door, he saw an African-American male, approximately 5 feet 11 inches or 6 feet tall. The man had a much wider build than Jacob’s own build of 120 pounds. At the time, Jacob believed that the man at the door was “Ice,” an individual whom he had met on two or three prior occasions. In court, however, Jacob identified defendant as the man who had knocked on the door. Jacob stated that defendant asked if he could come in out of the rain and wait for a ride that he had coming. Jacob let defendant in. Defendant did not appear to be under the influence of alcohol or drugs. Jacob estimated that defendant entered the trailer at about 12:30 a.m.

After defendant entered the trailer, Jacob went back to JoAna and told her that someone else was in the trailer and that she should not leave the bedroom without her clothes on. When Jacob came out of the bedroom, defendant confronted him, put a knife to his throat and forced him back into the bedroom. According to Jacob, defendant threatened to kill the Bollingers if they screamed or tried to get away. Jacob stated that defendant pressed the knife against his throat and forced him to open some jewelry boxes and pick through the belongings on top of the bedroom dresser. Defendant then asked the Bollingers where their money was. When JoAna told defendant that their money was in her purse in the living room, defendant switched the knife to her throat and forced both JoAna and Jacob into the living room. After Jacob gave defendant about $80 from JoAna’s purse, they all returned to the bedroom.

Once in the bedroom, defendant pushed Jacob to the floor and JoAna onto the bed. Defendant continued to search for money and again threatened to kill the Bollingers. He then returned to the bed, lowered his pants and forced JoAna to perform oral sex upon him, as Jacob sat next to the bed watching. According to Jacob, defendant then raped JoAna vaginally and anally. Jacob stated that, during these acts, defendant slashed JoAna’s back with the knife and that, in reaction, Jacob moved. Defendant then grabbed JoAna’s hair, cut off a large piece, threw it at Jacob, and told Jacob not to move, or he would cut JoAna’s throat.

After defendant threw the hair at Jacob, he told Jacob to lie down on the floor next to the bed. Jacob did so. Defendant continued to rape JoAna. Defendant then got up, pulled Jacob up from the floor, pushed him against the bed with a knee in his back and tied a pair of long-johns around his throat. Jacob looked up and saw that JoAna was lying on the bed, “white and real pale” and that “she was alive, but she didn’t look alive.” Jacob then began to fight back. Jacob grabbed the long-johns and started pulling on them, trying to get air. Defendant then hit Jacob in the back of the head.

Jacob stated that the next thing he could remember was coming out of the hallway and running for the front door. When he got to the door, he discovered that it was locked. Defendant caught up with Jacob and, as the two fought in the living room and kitchen area, defendant hit Jacob several times in the head with a heavy object. Jacob testified that he kept slipping on blood as defendant continued to strike him, but that, eventually, he was able to get to the front door, open it, and escape. Jacob then ran to the trailer of his neighbor, Ricky Harvey, and banged on the door. Jacob did not wait for anyone to answer, however, but instead, continued to run, jumped over a fence, and collapsed in some weeds. He awoke to find a police officer standing over him. Jacob was taken to the hospital where he was treated for cuts and large gashes to his head and eye.

In court, Jacob identified rings which were found in defendant’s pocket at the time of his arrest as ones which belonged to JoAna and which were taken by defendant during the attack. Jacob also identified an adjustable wrench which was recovered from a wooded area outside the trailer as one which he had kept in a tool box in his bedroom. Jacob stated that the wrench was consistent with the object defendant used to strike him in the head. Jacob also identified a knife which was recovered outside the trailer as the one which was used by defendant. Jacob stated that this knife did not belong to the Bollingers.

On cross-examination, Jacob explained how in the weeks following the attack he gave several statements to the police, and how, in each statement, he provided additional information to the police as it returned to his memory. Jacob acknowledged that he may have left both major and minor details out of his statements.

Jacob also acknowledged that he had smoked marijuana with his neighbor, Kathy Kunkle, on two or three occasions prior to the attack. He denied using drugs with his neighbor Ricky Harvey or with another neighbor with whom he was familiar, Anthony Graham. Jacob stated that he had continued to smoke marijuana since the time of the attack.

Jacob was also cross-examined regarding his identification of defendant as the assailant, in light of his initial belief that it was “Ice,” known to Jacob at the time of trial as Willie Sims, who appeared at his door on the night of the attack. Jacob testified that, about six weeks before the attack, he gave a ride to a man he met on the street, in the trailer park. Jacob spent about an hour with the man, taking him to two stores. The man told Jacob that he was called “Ice.” Jacob stated that he might have seen “Ice” previously at Rickey Harvey’s trailer but that he was not certain that this was the person he had seen. Jacob also stated that he did not know if the person he took to the stores was “Ice, ” 
i.e.
, Willie Sims, or defendant.

On redirect, Jacob stated that he had heard that “Ice” might have been defendant’s cousin. Jacob also said that he was certain that defendant was the man who attacked him and murdered JoAna. Referring to defendant, Jacob told the jury, “I know he did it. I can look at him and know that’s the face I saw. That’s a face I will never forget.”

Vickie Jamison, a resident of the trailer park, also testified for the State. Jamison stated that, at about 3:30 a.m. on October 24, 1994, a man knocked on her door and told her to “hurry up and let him in.” In court, Jamison identified defendant, whom she had known for about one month, as this man. According to Jamison, once defendant was in the trailer, he kept looking out the window and told Jamison, “If anybody comes to the door, don’t let them in.” He then fell asleep. Jamison told the jury that she had seen defendant earlier, at approximately 8 or 9 p.m., drinking with friends. She also stated that on both occasions when she saw defendant, he was wearing black boots, tan pants, a green and blue shirt, and a cap. Jamison testified that defendant left her trailer at about 8:30 or 9 a.m. on the morning of October 24. Before he left, defendant asked Jamison for a change of shirt. Jamison complied, and defendant left behind his blue and green shirt, and his cap. Jamison threw the shirt and cap into her closet with her dirty clothes. She later gave these items to the police when they came to her trailer and told her defendant “had killed somebody.” In court, Jamison identified the boots recovered from defendant at the time of his arrest as the ones he wore on the night of October 23 and the early morning of October 24. Jamison also stated that, on October 24, she “went to the public aid office and found out that [defendant] had killed somebody.”

On cross-examination Jamison acknowledged that she had been convicted of perjury and theft. Jamison stated that she knew her neighbors Ricky Harvey and Kathy Kunkle and was aware that defendant socialized and did drugs with them. Jamison also knew a man who was called “Ice” and knew that “Ice” hung around with Ricky Harvey and others in the trailer court.

Detectives Doug Jones and Dave Ellis, of the Belleville police department, testified that defendant was arrested about six or seven blocks from the Bollingers’ trailer at 8:47 a.m. on October 24, 1994. The officers had been searching for defendant on the morning of October 24 based upon information gathered during interviews conducted in the trailer park. At the time of arrest, defendant appeared to be about 6 feet or 6 feet one inch tall, and appeared to weigh between 180 and 200 pounds. Defendant did not appear to be injured or under the influence of alcohol or drugs. At the Belleville police station, police officers recovered four women’s rings, an earring stud and approximately $24 in currency from defendant’s pocket. Defendant’s boots and pants were also taken into evidence.

Jones and Ellis both testified that, after defendant was given 
Miranda
 warnings, he made two statements, each of which was written out by Ellis. Defendant initially denied being at the scene of the murder. However, in his first statement, he described the following series of events. According to defendant, he had known the Bollingers for approximately two months, and had been engaged in a consensual sexual relationship with JoAna for the previous two weeks. On the morning of October 24, 1994, at about 1 a.m., defendant entered the Bollingers’ trailer with their consent. Sometime thereafter, defendant went into the Bollingers’ bathroom and smoked cocaine. When defendant came out of the bathroom, he asked Jacob if he could borrow $10. Jacob told defendant that he did not have the money but that he would ask JoAna, who was in the bedroom, if she had any. When Jacob went into the bedroom, defendant, who remained in the living room, started looking for money in JoAna’s purse. Defendant found $80 and about four rings. Jacob came out of the bedroom and saw defendant taking the money from JoAna’s purse. The two fought. Defendant put Jacob in a choke hold and took him back to the bedroom. In the bedroom, defendant and Jacob began fighting again. Defendant hit Jacob over the head with a vase and knocked him out. Defendant then took a knife from the bedroom dresser and told JoAna, who was screaming, to shut up. He then put his right arm around JoAna’s throat and started choking her. JoAna kept fighting, but when defendant saw blood come out of her nose he let her go. Defendant then left the trailer, and threw his shirt and hat into some weeds as he walked off. Defendant later bought and smoked cocaine prior to his arrest.

In his second statement, defendant added the following facts. As defendant was choking JoAna, his arm got tired. He picked up a pair of white long-johns, wrapped them around JoAna’s throat and tightened them, causing blood to come out of her nose. After defendant dropped JoAna, Jacob awoke. Defendant took a pair of vise grips from a tool box in the bedroom and hit Jacob with them twice. He later threw the tool, and the knife, into the trees behind the Bollingers’ trailer. Just before being arrested, defendant stopped at “Vickie’s” trailer and asked her to retrieve the clothes which he had thrown into the weeds.

Belleville police detectives Stephen Krug and Stephen Schmulbach testified about their observations and preservation of the crime scene on October 24. Krug and Schmulbach stated that they arrived at the Bollingers’ trailer at approximately 4:50 a.m. They observed blood in various locations throughout the trailer, including large amounts of blood in the kitchen area and rear bedroom. They also observed JoAna Bollinger lying unclothed on the floor in the rear bedroom with a pair of dark blue pants around her neck. A bruise with some type of pattern was visible on her back. A clump of hair was found on the floor in the rear bedroom, next to the bed, and a broken ceramic mug was on the bed. From the living room, the detectives recovered a purse, coin purse and cosmetic case, as well as other items. An adjustable wrench and a knife were found in a wooded area outside the trailer. A shirt and cap were recovered from Vickie Jamison’s trailer later on October 24. A pair of long-johns was recovered from the Bollingers’ bedroom on 
October 28.

Schmulbach also stated that he attended the autopsy of JoAna Bollinger during the afternoon of October 24. At that time, the sole of a boot which had been taken from defendant at his arrest earlier in the day was compared to the bruise on JoAna Bollinger’s back. Schmulbach photographed the boot next to the bruise and stated that the bruise pattern was similar to the tread pattern on the sole of the boot.

Forensic pathologist Harry Parks performed the autopsy upon JoAna Bollinger on October 24. Parks believed that JoAna had been killed by strangulation, probably by some type of soft ligature. Parks also noted what appeared to be a boot or shoe imprint on JoAna’s back, similar to the sole of a boot shown to him by one of the police officers attending the autopsy. Swabs were taken of JoAna’s mouth, vagina and anus and given to the police officers.

David Peck, assistant laboratory director at the Illinois State Police forensic laboratory in Fairview Heights, testified as an expert in fingerprint and footwear impression analysis. Peck examined numerous items of evidence taken from the crime scene for fingerprints, including the wrench and knife recovered outside the Bollingers’ trailer, pieces of the broken ceramic mug, a leather purse and a cosmetic bag. Peck was unable to match any recovered fingerprints with defendant. Peck also stated that the bruise found on the back of JoAna Bollinger “could have” been made by one of defendant’s boots, based on the similarity of patterns on the soles of the boots and on the bruise. Peck was unable to state positively that one of defendant’s boots had made the impression on JoAna’s back because of a lack of individual identifying characteristics on the soles of the boots.

Donna Rees, a forensic scientist employed by the Illinois State Police forensic laboratory, testified as an expert in the area of serology. Rees stated that, based upon a type of blood analysis known as genetic marking analysis, bloodstains found on the kitchen floor of the Bollingers’ trailer, on the wrench found outside the trailer, on the pants taken from defendant at his arrest, and on the shirt recovered from Vickie Jamison’s trailer “could have” come from Jacob Bollinger but not from defendant or JoAna Bollinger. Rees also identified the presence of semen on the vaginal and rectal swabs taken of JoAna Bollinger. No semen was found on the oral swab.

Phillip Sallee, a forensic biologist at the Illinois State Police’s crime laboratory in Springfield, testified for the State regarding deoxyribonucleic acid (DNA) evidence. Sallee described generally the process of restriction fragment length polymorphism (RFLP) DNA profiling. Sallee said that he performed this type of DNA analysis upon blood samples taken from defendant and the Bollingers, and upon the seminal material found on the vaginal and rectal swabs taken of JoAna Bollinger. Sallee stated that he was able to develop a full DNA profile from the semen found on the vaginal swab and that this profile matched defendant’s DNA. Based upon his statistical calculations, Sallee determined that the odds that a person selected at random from the general population would have the same DNA profile as that developed from the semen sample taken from the vaginal swab were 16 million to one. Sallee concluded that there was a “good chance” that the semen found on the vaginal swab came from defendant. Sallee also stated that the DNA extracted from the semen found on the rectal swab matched defendant’s DNA. Sallee explained, however, that he was unable to develop a full DNA profile from the semen recovered from the rectal swab. Thus, according to Sallee, with respect to the semen sample taken from the rectal swab, the odds of a random match were one in every 200 African-American persons.

Defendant offered only one witness at trial, Ricky Harvey. Harvey testified that in October of 1994, he lived in a trailer across the street from the Bollingers. Harvey saw the Bollingers several times a week, and socialized with them on occasion. Defendant, whom Harvey had known for two years, stopped by almost daily to socialize with Harvey. According to Harvey, Jacob Bollinger knew both defendant and Willie “Ice” Sims and had seen both of them at Harvey’s trailer. On cross-examination, Harvey testified that he had seen defendant during the early morning hours of October 24, 1994, but that he had not seen Willie Sims. Harvey stated that he thought Willie Sims was in the county jail on that date.

There was no rebuttal evidence presented by the State. After closing arguments and instructions, the jury found defendant guilty of the first degree murder of JoAna Bollinger, guilty of the attempted murder of Jacob Bollinger, and guilty of armed robbery.

No witnesses were presented during the eligibility phase of the death penalty proceedings. Following arguments by counsel, the jury found defendant eligible for the death penalty, pursuant to section 9–1(b)(6) of the Criminal Code of 1961, for having committed murder in the course of another felony.

At the final phase of the sentencing hearing, the State presented evidence that defendant had been convicted of theft in St. Clair County on June 7, 1994, and had been sentenced to a one-year term of imprisonment. The State also presented evidence that defendant had been convicted of theft in St. Clair County twice in February 1994, and had received a sentence of one year of probation for each offense.

The State then called Cynthia Braun, defendant’s former parole agent, to testify in aggravation. Braun stated that defendant had been released from prison and placed on one year’s supervised release on August 15, 1994. Upon his release, defendant requested and received employment and housing referrals from Braun. On cross-examination, Braun acknowledged that defendant had been identified as cocaine dependent while he was in prison. Braun stated that she did not provide defendant with any substance abuse counseling because defendant did not request it. She did not know if defendant had received any counseling while in prison.

Jesse Vineyard, a correctional officer at Menard prison, also testified in aggravation. Vineyard stated that in November 1995, prison officials conducting a routine inspection discovered a piece of metal, or shank, approximately an inch and a half wide by eight inches long, in defendant’s cell. Vineyard stated that, as a result of this incident, a hearing was held before the prison’s disciplinary committee. Defendant was found guilty of violating prison rules and lost various prison privileges.

Marilyn Stofleth, JoAna Bollinger’s grandmother, was the State’s final witness in aggravation. Stofleth read a victim impact statement to the jury.

In mitigation, the defense called one witness, defendant’s mother, Joyce Wheeler. Wheeler testified that defendant was born in 1972, when she was 16. She also stated that defendant had a brother who was two years older than he was, and that she had never married the boys’ father. Wheeler and her sons moved from Centerville, Illinois, to Minnesota when defendant was three, and then to California was defendant was four. The family returned to Centerville in 1986, when defendant was 14. Defendant was a good student while in California, but went “haywire” and “wild” after returning to Centerville. According to Wheeler, this was due in part to the murders of his uncle in 1986 and cousin in 1987. Defendant began skipping school and getting into trouble with the law after these murders. Defendant never completed the ninth grade.

Wheeler stated that defendant had abused drugs, specifically alcohol and cocaine, since he was 16 years old. Wheeler explained that defendant had pursued voluntary substance abuse treatment at the Gateway Center in Belleville when he was 16, and that he had also received treatment from centers in St. Louis and the Chicago area. However, defendant received no treatment for substance abuse upon his release from prison in 1994. Wheeler had unsuccessfully urged defendant to get more treatment at that time. Wheeler stated that, when defendant was on drugs, his personality changed and he became loud, rude and disrespectful. Wheeler also told the jury that defendant was the father of two boys, five and four years old, who now live with their mother. Defendant had lived with his sons for at least three years.

After closing arguments, the jury concluded that there were no mitigating circumstances sufficient to preclude the imposition of the death penalty. Defendant was sentenced to death. The court subsequently sentenced defendant to two consecutive 30-year prison terms for the attempted murder and armed robbery convictions. This appeal followed.

ANALYSIS

Motion to Suppress Statements

Prior to trial, defendant filed a motion to suppress the statements which he made to the Belleville police on October 24, 1994. In the motion, defendant alleged that the statements were given involuntarily and were obtained in violation of 
Miranda v. Arizona
, and that he had been arrested without a warrant and without probable cause. Following a hearing, the circuit court found that defendant “became a suspect after a canvas of the neighborhood the morning of the murder” and concluded that “defendant’s statement was voluntary and made with 
Miranda
.” The circuit court denied defendant’s motion to suppress. On appeal, defendant does not contend that the statements which he gave to the Belleville police were involuntary or that his 
Miranda
 rights were violated. Instead, defendant repeats his assertion that the police lacked probable cause to arrest him on October 24.

At the hearing on defendant’s motion to suppress, the State presented the testimony of Belleville police detectives David Ellis and Doug Jones. Ellis testified that he was called to the Bollingers’ trailer at about 4:30 a.m. on the morning of October 24. Once at the trailer, he familiarized himself with the background of the case by speaking to the officers who had first arrived at the murder scene. He then began interviewing people who were present in the trailer park.

Ellis stated that one of the people he spoke to was Tony Graham, a resident of the trailer park. Graham told Ellis that he had heard “a bunch of noise” coming from the Bollingers’ trailer, “like someone was trying to get out” and, at the same time, had seen, through a window, a person inside the Bollinger’s trailer. Graham gave Ellis a description of the person he had seen. Shortly thereafter, Ellis related this description to another trailer park resident, Kathy Kunkle. Kunkle told Ellis that the description “was Paris Sims or sounded like Paris Sims.” Kunkle also told Ellis that she had seen defendant the previous evening at Ricky Harvey’s trailer. According to Ellis, Belleville police officers spoke with Harvey and confirmed that defendant had, in fact, been at Harvey’s trailer on the night of October 23. Police officers also noted that Harvey’s trailer was located across the street from the Bollingers’ trailer. Ellis further testified that, at the time he and Jones were gathering information, he knew that defendant was frequently in the trailer park where the murder was committed. Ellis also stated that, because of previous arrests, he had some familiarity with defendant prior to October 24, 1994.

Ellis told the court that after speaking with Kunkle, he and Detective Jones went to a convenience store to speak to a relative of defendant in an attempt to locate him. The convenience store was located about four or five blocks from the Bollingers’ trailer. At the time, Ellis and Jones had with them a picture of defendant and a personal history sheet which had been filled out during one of defendant’s previous arrests. Ellis stated that, as he and Jones were leaving the store, they saw a man walking down the street who resembled the picture of defendant they had with them. The detectives got into their unmarked car and drove past the man once or twice, discussing between themselves if the man was, in fact, the person in the picture. They decided that it was. The detectives stopped their car, got out, approached the man and asked him his name. The man told them that his name was Dennis Jones. On defendant’s personal history sheet were listed identifying marks such as scars and tattoos. Ellis and Jones noticed that a scar and tattoo listed on the sheet were on the man they had approached. The detectives then asked the man his birth date. The man gave defendant’s date of birth, which was also listed on the personal history sheet. The detectives concluded that the person before them was indeed defendant. They advised defendant that he was under arrest and transported him to the Belleville police station. Ellis stated that defendant was arrested at about 8:47 a.m.

Detective Jones also testified at the suppression hearing. Jones’ testimony corroborated Ellis’ description of defendant’s arrest near the convenience store.

The special concurrence concludes that we need not address whether defendant was arrested without probable cause because defendant did not actually move to suppress his confession as the fruit of an unlawful arrest and, consequently, never met his initial burden of establishing a 
prima facie
 case that his arrest was unlawful under section 114–12(b) of the Code of Criminal Procedure (725 ILCS 5/114–12(b) (West 1998)) (see, 
e.g.
, 
People v. Ertl
, 292 Ill. App. 3d 863, 868 (1997)). In addition, the special concurrence concludes that, even though the State introduced the testimony of Detectives Ellis and Jones concerning their investigation of the crimes and the events preceding defendant’s arrest, probable cause was not litigated at the suppression hearing. We disagree. Defendant’s motion to suppress plainly asserts that he was arrested without a warrant and without probable cause. The State, on appeal, expressly acknowledges that defendant was arrested without a warrant. Further, in its brief before this court, the State argues only that defendant was arrested with probable cause. The State does not contend, in any way, that defendant failed to establish a 
prima facie
 case that his arrest was unlawful, or that defendant otherwise forfeited his right to challenge the legality of his arrest before this court. Thus, the State has conceded that defendant met his 
prima facie
 burden and that probable cause was litigated at the suppression hearing. Indeed, the testimony of Ellis and Jones would have been unnecessary and irrelevant if the only contested issue was the voluntariness of defendant’s statements given at the police station. We see no reason to disregard the State’s concessions, particularly when those concessions coincide with defendant’s characterization of the proceedings below. Accordingly, we address the issue of the legality of defendant’s arrest as framed by the parties to this appeal, 
i.e.
, whether defendant’s warrantless arrest was made with probable cause.

To effect a valid, warrantless arrest, a police officer must have probable cause to arrest. 
Beck v. Ohio
, 379 U.S. 89, 91, 13 L. Ed. 2d 142, 145, 85 S. Ct. 223, 225 (1964); 
People v. Kidd
, 175 Ill. 2d 1, 22 (1996). Probable cause to arrest exists where the facts and circumstances known to the police officer at the time of the arrest are sufficient to warrant a person of reasonable caution to believe that an offense had been committed and that the offense was committed by the person arrested. 
People v. Lippert
, 89 Ill. 2d 171, 178 (1982). Mere suspicion is inadequate to establish probable cause to arrest, but the evidence relied upon by the arresting officers does not have to be sufficient to prove guilt beyond a reasonable doubt. 
Kidd
, 175 Ill 2d at 22. Notably, because “an arrest not only serves the function of producing persons for prosecution but also serves an investigative function, courts have not ruled that an arrest can occur only when the known facts indicate that it is more probable than not that the suspected individual has committed the crime.” 
Lippert
, 89 Ill. 2d at 179; see generally 2 W. LaFave, Search & Seizure §3.2(e), at 64-68 (3d ed. 1996).

The existence of probable cause is determined by the totality of the circumstances at the time of the arrest. 
People v. Tisler
, 103 Ill. 2d 226 (1984) (following the standard set forth in 
Illinois v. Gates
, 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317 (1983)); 
People v. Williams
, 147 Ill. 2d 173, 210 (1991). Further, a determination of probable cause is governed by commonsense, practical considerations, and not by technical legal rules. 
People v. Buss
, 187 Ill. 2d 144, 204 (1999), quoting 
Kidd
, 175 Ill. 2d at 24. Because the present case involves the application of the law to undisputed facts, our standard of review is 
de novo
. 
Buss
, 187 Ill. 2d at 205; 
People v. Krueger
, 175 Ill. 2d 60, 64 (1996).

After examining the totality of the circumstances known to detectives Ellis and Jones at the time defendant was apprehended, we conclude that the officers had probable cause to effectuate an arrest. The record in the case at bar shows that the detectives, while investigating a brutal murder and attempted murder, canvassed the Bollingers’ trailer park in an attempt to gather information about the crimes. The only known witness to the murder, Jacob Bollinger, was hospitalized with head injuries and incoherent when Ellis and Jones began their interviews. The detectives were initially given a physical description of a suspect by a neighbor, Tony Graham, who reported seeing someone in the Bollingers’ trailer. When the detectives gave this description to another neighbor, Kathy Kunkle, she provided them with defendant’s name. Both Graham and Kunkle provided information in their capacity as ordinary citizens. Neither Graham nor Kunkle was an anonymous informant or a paid, criminal informant. See 
Kidd
, 175 Ill. 2d at 23 (fact that the defendant’s name was given to police by someone other than a paid informer is a factor in the probable cause analysis). Moreover, there is no indication in the record that Graham and Kunkle were biased against defendant in any way.

At the time of defendant’s arrest, Ellis and Jones also knew that defendant frequently visited the trailer park. They knew specifically that defendant had been across the street from the Bollingers’ trailer hours before the murder occurred. The detectives located defendant, unexpectedly, four or five blocks from the murder scene hours after the murder had taken place. When the officers approached defendant on the street, he gave them a name which they knew to be false. See 
People v. Williams
, 79 Ill. App. 3d 817, 821 (1979) (suspect’s giving of false name a factor in establishing probable cause); 2 W. LaFave, Search & Seizure §3.6(f), at 327 (3d ed. 1996) (responses by the suspect which the officer knows to be false may be a factor in constituting probable cause). Considering the totality of the circumstances set forth above, we believe that Ellis and Jones had probable cause to arrest defendant.

Defendant argues, however, that certain facts known to the detectives at the time of the arrest must be discounted from our probable cause analysis. Citing to case law which held that a suspect’s presence near a crime scene, by itself, is insufficient to establish probable cause (see, 
e.g.
, 
People v. Carnivale
, 61 Ill. 2d 57, 58 (1975)), defendant contends that the fact that he was placed close to the Bollingers’ trailer both before and after the murder is “virtually irrelevant” to whether the detectives had probable cause to effectuate an arrest. As the State points out, however, defendant was not arrested based solely on his presence near the crime scene. In addition, we know of no reported decision which holds that a suspect’s proximity to a crime scene is irrelevant to establishing probable cause to arrest. 
Cf
. 
Lippert
, 89 Ill. 2d at 181 (discussing fact that the defendant was found in an area near the crime scene and noting generally that the police are not required to assume that a suspect has put as much distance between himself and the crime scene as is possible). Accordingly, we determine that defendant’s location both before and after the murder may properly be considered as factors in determining whether Ellis and Jones had probable cause to arrest defendant.

Defendant also argues that Kathy Kunkle’s identification of defendant must be discounted from our probable cause analysis because the State has failed to adequately explain how she arrived at defendant’s name. Defendant asserts that, at the suppression hearing, the State offered no evidence of the specific description given by Tony Graham to the police of the man he saw in the Bollingers’ trailer. Therefore, according to defendant, “the State may not rely upon Kunkel’s having named [defendant], as the basis of her knowledge is wholly unknown and unexplained.”

In probable cause jurisprudence, the term “basis of knowledge” refers to how a criminal or citizen informant has acquired information that has been given to police. 
Tisler
, 103 Ill. 2d at 239. An examination of an informant’s basis of knowledge helps ensure that an arrest based upon information received from that informant is predicated upon something more substantial than conclusory allegations or “casual rumor.” 
Spinelli v. United States
, 393 U.S. 410, 416, 21 L. Ed. 2d 637, 644, 89 S. Ct. 584, 589 (1969). The basis of knowledge inquiry is not a separate or independent test which must be satisfied in order to establish probable cause. 
Tisler
, 103 Ill. 2d at 237-40. Rather, an informant’s basis of knowledge is simply a relevant factor to be considered as part of the totality of the circumstances known to police at the time of the arrest. 
Kidd
, 175 Ill. 2d at 23, quoting 
People v. Adams
, 131 Ill. 2d 387, 398 (1989).

In the case at bar, the evidence shows that Kunkle’s identification of defendant was not based on casual rumor. To the contrary, the evidence of record shows that Kunkle had personal knowledge of defendant, and that she provided Ellis and Jones with defendant’s name only after the officers had relayed Graham’s description to her. The detectives, therefore, were well aware that Kunkle was not making a bald assertion that defendant had committed the murder, nor was she simply reporting “an offhand remark heard at a neighborhood bar.” 
Spinelli
, 393 U.S. at 417, 21 L. Ed. 2d at 644, 89 S. Ct. at 589. 
Cf
.
 People v. Wilson
, 260 Ill. App. 3d 364 (1994) (finding no probable cause to arrest where police had no indication whatsoever as to how a robbery victim’s daughter was able to identify defendants as the assailants).

Moreover, under the totality of the circumstances approach to establishing probable cause, an imperfect expression of the basis of knowledge may nevertheless suffice to establish probable cause when considered together with the other relevant facts known to the police at the time of the arrest. 
Tisler
, 103 Ill. 2d at 240-41; 2 W. LaFave, Search & Seizure §3.3(d), at 145 (3d ed. 1996). As stated, Kunkle’s identification of defendant was not the sole relevant factor under consideration by the police. The law requires us to consider Kunkle’s identification of defendant as part of the totality of the circumstances known to the police at the time of the arrest, and to review all the known circumstances in a practical, nontechnical way. After carefully considering the evidence of record, we have determined that Detectives Ellis and Jones had probable cause to arrest defendant. Accordingly, we hold that the circuit court properly denied defendant’s motion to suppress.

Reading of the Indictment at the Fitness Hearing

Defendant’s trial took place in September 1997. In July 1997, a fitness hearing was conducted before a separate jury. During the hearing, the State presented the testimony of two witnesses, Dr. John Rabin and Delancey Moore. Rabin, a forensic psychiatrist, testified that he had tried to examine defendant in May 1997. During that examination, defendant answered “I don’t know” to several questions, but in response to other questions, he simply stared and whispered to himself. At other times, defendant made comments of a religious nature. Rabin terminated this interview after about 20 minutes. Rabin attempted a second examination in June of 1997, but defendant would not leave his cell to meet with Rabin. Because of defendant’s refusal to cooperate, Rabin stated that he was unable to render an opinion as to whether defendant was fit to stand trial. Rabin also testified that it was possible that defendant was malingering, or faking a psychological disorder, during his examinations. Rabin noted that malingering should be suspected when there is a “medical legal context of the presentation,” 
i.e.
, when someone is charged with a crime or involved in litigation.

Moore, a classification specialist in the St. Clair County sheriff’s department, testified that he was in charge of determining the housing and placement for all inmates in the county jail, and that he was the chair of the jail’s disciplinary committee. Moore stated that, as a general matter, he would not hold a disciplinary hearing unless the inmate understood the nature of the charges and proceeding. Moore explained that he had dealt with defendant at disciplinary proceedings in the county jail in April 1997, and in June 1997. During the April proceedings, defendant had requested that a witness be called on his behalf. According to Moore, defendant was competent, aware of his surroundings, and cognizant of the nature of the proceedings in both April and June.

Defendant’s mother and grandmother testified on defendant’s behalf during the fitness hearing. Both women stated that defendant’s mental condition had deteriorated since his incarceration, that he was frequently unable to recognize them, and that he suffered memory lapses.

Defendant also presented the testimony of clinical psychologist Dr. Michael Gelbort. Gelbort stated that he examined defendant during two 45-minute sessions in March 1997. During these sessions, defendant was largely uncommunicative and unresponsive, but he also engaged in consistent delusional behavior. According to Gelbort, most of defendant’s words and conduct appeared to be in response to his own internal thoughts. Defendant mumbled to himself, spit and stomped on the floor to get rid of imaginary bugs, and repeatedly asked for cigarettes despite Gelbort’s statements that he had none. Defendant also indicated that he was hearing voices, and spoke of God and other matters in a jumbled manner. Because of the consistency of his behavior, Gelbort concluded that defendant was not “gilding the lily,” or faking psychological symptoms. Based upon his examinations of defendant, as well as discussions with jail personnel, Gelbort determined that defendant was unfit to stand trial. Gelbort was cross-examined at length regarding the basis of his conclusion that defendant was unfit, and about the possibility that defendant was malingering.

During the State’s cross-examination of Gelbort, the State sought to have Gelbort read the charging indictment. The State’s purpose in introducing the indictment was to rebut Gelbort’s conclusion that, while defendant might have some rudimentary understanding of the crimes he was charged with, he was unable to “understand what the implication of those charges would be.” The indictment stated, 
inter alia
, that defendant was charged with committing “the offense of FIRST DEGREE MURDER *** in that he, without lawful justification and with the intent to kill Joana Bollinger, strangled Joana Bollinger, thereby causing the death of Joana Bollinger.” Defendant objected to this cross-examination, arguing that the indictment described the circumstances of the murder, and that these circumstances were irrelevant and would unduly inflame the jury. The objection was overruled. Gelbort read the indictment aloud and, after questioning, concluded that, “with some coaching,” defendant could understand what the indictment meant. At the conclusion of the fitness hearing, the jury found defendant fit to stand trial.

Defendant now argues that the circuit court erred when it permitted Gelbort to read the indictment before the jury, and that as a result of this error, a new fitness hearing and a new trial are required. The State, in response, correctly observes that this argument is procedurally defaulted because defendant failed to include it in his post-trial motion. See 
People v. Enoch
, 122 Ill. 2d 176, 186 (1988). Nevertheless, pursuant to Supreme Court Rule 615(a) (134 Ill 2d R. 615(a)), this court may review an argument not properly preserved if we conclude that plain error affecting a substantial right has occurred. 
People v. Shaw
, 186 Ill. 2d 301, 326-27 (1998). Before invoking the plain error exception, however, “it is appropriate to determine whether error occurred at all.” 
People v. Wade
, 131 Ill. 2d 370, 376 (1989).

Initially, we note that the scope of defendant’s argument regarding the indictment is somewhat unclear. In his opening brief, defendant appears to argue only that it was error to allow the jury to hear about the manner in which JoAna Bollinger was murdered, 
i.e.
, that she had been strangled. In his reply brief, however, defendant states that the jury should not have been told that defendant was charged with murder at all. We do not believe that defendant may assert this latter argument.

At several times during the fitness proceedings, the members of the jury were told that defendant had been charged with murder. Some of these occasions were initiated, or acquiesced in, by defense counsel. For example, during the questioning of the prospective jurors for the fitness hearing, a concern was raised about the publicity which defendant’s case had received. The following colloquy then occurred:

“[Defense counsel]: I would suggest that just a very broad general question concerning the fact be just that this received some publicity, and if they have read any newspaper articles or seen any television or heard any radio concerning this case. And I believe we’d have to probably, in conjunction with that, probably mention that the–names of the alleged victims here.

THE COURT: Right. And it would seem to me a little follow up question for any juror who is considering the question of whether they heard anything as to what it is we are talking about. Does that mean that we need describe anything other than the First Degree Murder charge?

[Defense counsel]: I don’t think we do.”

Later, during opening arguments before the jury, defense counsel stated:

“Dr. Gelbort will testify *** that [defendant’s] here but he doesn’t understand that he’s charged with murder; that he doesn’t understand that he will be going for–before a jury at some future point where his guilt or innocence of that murder will be determined; that he doesn’t understand either the proceedings or that he’s in fact, charged with murder.”

In light of the foregoing, defendant cannot now contend that, because the indictment stated that defendant was charged with murder, the trial court erred when it permitted the indictment to be read before the jury. See, 
e.g.
, 
People v. Abston
, 263 Ill. App. 3d 665, 671 (1994) (where the defendant acquiesces in the trial court’s course of action, the defendant cannot raise that course of action as error on appeal).

Defendant’s remaining argument is that his fitness hearing was irreparably tainted by the fact that the jury heard that JoAna Bollinger had been murdered by strangulation. In defendant’s view, the circumstances of the victim’s murder were irrelevant to the question of whether defendant understood the technical, legal charges against him. In addition, according to defendant, there is a strong possibility that, when the jury heard that JoAna Bollinger had been strangled, the jury lost its focus on whether defendant was fit to stand trial, and instead improperly focused on the nature of the crime. Thus, defendant argues that he is entitled to a new fitness hearing and new trial. We disagree.

Even if we assume that the circumstances of JoAna Bollinger’s murder were irrelevant to determining the question of defendant’s fitness, the admission of those circumstances was clearly harmless. Before Gelbort read the indictment, the jury knew that JoAna Bollinger had been murdered, and knew, obviously, that the murder had been committed in some manner. No graphic or inflammatory details of the murder were included in the indictment. Indeed, the only descriptive term in the indictment is the word “strangled.” Furthermore, before beginning its deliberations, the jury was properly instructed that the only issue it was to decide was defendant’s fitness to stand trial. Under the facts of this case, we find that no reversible error occurred when the indictment was read before the jury. Consequently, we also find no plain error. See 
People v. Keene
, 169 Ill. 2d 1, 17 (1995) (all plain errors are reversible errors).

Motion 
in Limine
 to Limit the Cross-Examination of Phillip Sallee

In August, 1997, the State filed a motion 
in limine
 to bar the defense from pursuing an area of impeachment during the cross-examination of the State’s DNA expert witness, Phillip Sallee. Specifically, the State sought to bar from evidence the fact that Sallee had entered into a “predisciplinary agreement” with his employer, the Illinois State Police, for his theft of state-owned microscopes, which occurred on or about January 7, 1995. According to the State’s motion, the terms of the predisciplinary agreement required Sallee to perform a period of community service, to be suspended from work for a period of time without pay, and to forfeit vacation benefits. By August 1997, according to the motion, Sallee had completed the terms of the predisciplinary agreement and was considered an employee “in good standing.” After hearing brief arguments, the circuit court granted the State’s motion 
in limine
, ruling that the evidence of Sallee’s misconduct was irrelevant and collateral to the ultimate issues to be decided by the jury.

Before this court, defendant contends that the circuit court erred when it barred the defense from impeaching Sallee with evidence of the predisciplinary agreement, and that this error requires reversal of his convictions and a new trial. The State initially maintains that this issue is procedurally defaulted because defendant failed to preserve the objection to the motion 
in limine
 in his post-trial motion. See 
Enoch
, 122 Ill. 2d at 186. Defendant, in turn, responds that the circuit court’s denial of his right to cross-examine Sallee rendered his trial fundamentally unfair and that this court may review the issue as plain error. For the reasons set forth below, we find no error in the trial court’s granting of the State’s motion
 in limine
. Accordingly, we also find no plain error and no basis to excuse defendant’s procedural default.

In criminal proceedings, a defendant has the right to cross-examine a witness regarding the witness’ biases, interests or motives to provide false testimony. 
People v. Triplett
, 108 Ill. 2d 463, 475 (1985). “With this method of impeachment, ‘the fact that a witness has been arrested or charged with a crime may be shown or inquired into where it would reasonably tend to show that his testimony might be influenced by interest, bias or a motive to testify falsely.’ ” 
Triplett
, 108 Ill. 2d at 475, citing 
People v. Mason
, 28 Ill. 2d 396, 401 (1963). “[C]ross-examination is proper whenever the prosecution has sufficient ‘leverage’ over the witness justifying the defendant’s claim that the witness has an interest or bias, or that there is corruption or coercion that would tend to make the witness testify falsely.” M. Graham, Cleary & Graham’s Handbook of Illinois Evidence §607.7, at 436-37 (7
th ed. 1999). However, the evidence used to impeach a witness “ ‘must give rise to the inference that the witness has something to gain or lose by his testimony.’ ” 
Triplett
, 108 Ill. 2d at 475-76, quoting 
People v. Phillips
, 95 Ill. App. 3d 1013, 1020 (1981). Therefore, the evidence used to establish bias, interest or motive should be timely, unequivocal and directly related. M. Graham, Cleary & Graham’s Handbook of Illinois Evidence §607.7, at 440 (7th ed. 1999). The evidence used must not be “remote or uncertain.” 
Triplett
, 108 Ill. 2d at 476.

In 
People v. Bull
, 185 Ill. 2d 179 (1998), this court addressed a claim similar to that presented by defendant in the case at bar. In 
Bull
, the State filed a motion 
in limine
 to bar the defense from cross-examining David Metzger, an employee of the Illinois State Police crime laboratory, regarding his administrative disciplinary record. Like Sallee, Metzger had been caught stealing a microscope and had been subject to various disciplinary measures by his employer. The circuit court granted the State’s motion. 
Bull
, 185 Ill. 2d at 205.

On appeal, the defendant in
 Bull
 argued that it was error to allow the motion 
in limine
 because cross-examination of Metzger regarding his disciplinary record with the State Police crime laboratory would show that Metzger had a “motive to testify falsely or to embellish his testimony to please his employers.” 
Bull
, 185 Ill. 2d at 206. This court rejected that argument, stating:

“The record is too speculative and remote to infer that Metzger had something to gain or lose by his testimony. As the trial court noted, the administrative charges arose approximately two years 
after
 Metzger had completed and reported his DNA analysis in this case. Further, trial occurred approximately one year after Metzger was disciplined. At trial, Metzger’s testimony regarding his DNA analysis of defendant was based on the three-year-old report.” (Emphasis in original.) 
Bull
, 185 Ill. 2d at 207.

In the instant case, the State argues that 
Bull
 disposes of defendant’s claim. The State maintains that the evidence which defendant wished to use to impeach Sallee in this case, like in 
Bull
, was too speculative and remote to be admitted. Defendant, in response, attempts to distinguish 
Bull
 by focusing on the timing of the administrative action taken against Sallee. Defendant argues that, unlike 
Bull
, in this case, Sallee “was the subject of disciplinary proceedings at the precise time he was conducting DNA testing on the evidence” in defendant’s case. Thus, in defendant’s view, at the time Sallee was conducting his DNA testing, he had a motive to curry favor with his employer by giving results favorable to the State’s case. Accordingly, defendant asserts that the State’s reliance on 
Bull
 is misplaced.

Defendant’s argument that 
Bull
 is factually distinguishable from the case at bar is not clearly supported by the record. As defendant correctly notes, the record does affirmatively show that Sallee was engaged in the testing of DNA evidence from November 1994 through March 1995. The record also shows that the microscopes were stolen on or about January 7, 1995. However, the record does not disclose when officials at the State Police crime laboratory became aware of the theft of the microscopes or when the disciplinary charges were brought. Nevertheless, even if we assume that the disciplinary proceedings were commenced prior to the completion of the DNA testing, we do not believe that Sallee’s disciplinary record would have been admissible to impeach him.

Defendant’s contention is that Sallee had a motive to fabricate DNA results which implicated defendant because at the time of the DNA testing, Sallee was facing disciplinary proceedings in the State Police crime lab. For this contention to be correct, a number of assumptions would have to true. For example, it would have to be assumed that, having been discovered stealing microscopes and with his livelihood in jeopardy, Sallee’s immediate reaction would be to start fabricating evidence in a case which he was currently working on; that Sallee would begin fabricating evidence, with all the attendant risks of doing so, even though he did not yet know whether defendant’s case would be tried, or whether some other disposition, such as defendant pleading guilty or being exonerated by other evidence, would occur; that Sallee would risk fabricating evidence even though he did not yet know if he would, in fact, be called to testify at defendant’s trial; that he would risk fabricating evidence even though by doing so, he would be helping only the prosecutors in St. Clair County, who would have no control or “leverage” over the disciplinary proceedings in the crime lab in Springfield; and that he would risk fabricating evidence as a means of lessening his administrative discipline even though the crime lab might reasonably be expected to be concerned about its reputation and integrity, and, therefore, might not look favorably upon one of its employee’s fabricating evidence. In light of the foregoing, and in the absence of any evidence other than the mere existence of the disciplinary agreement, we find any alleged incentive on Sallee’s part to fabricate DNA evidence because of the disciplinary proceedings arising out of the theft of the microscopes remote and uncertain. We therefore find no error in the circuit court’s granting of the State’s motion 
in limine
. Having found no error, it follows that there can be no plain error in the circuit court’s granting of the State’s motion. Accordingly, defendant’s claim is procedurally defaulted.

Hearsay Testimony of Vickie Jamison

Testifying for the State, Vickie Jamison told the jury that defendant came to her trailer in the early morning hours of October 24, 1994, stayed the night, and then left around 8:30 a.m. Jamison also testified that, later on October 24, officers of the Belleville police department came to her trailer and requested information about defendant. According to Jamison, the officers informed her that defendant “had killed somebody.” Jamison also stated that she initially heard about defendant’s involvement in the murder when she “went to the public aid office and found out that [defendant] had killed somebody.”

Defendant argues that the foregoing statements made by Jamison were inadmissible hearsay and that, as a consequence of these statements, he was deprived of a fair trial. Defendant acknowledges that no objection was made to Jamison’s remarks at the time of trial and, therefore, that the present claim of error is procedurally defaulted. Defendant also argues, however, that this court should review the claim of error under the plain error doctrine. For the reasons explained below, we find no plain error.

Assuming, without deciding, that Jamison’s testimony was hearsay, its admission was clearly harmless. “The admission of hearsay evidence is harmless error where there is no reasonable probability that the jury would have acquitted the defendant absent the hearsay testimony.” 
People v. Nevitt
, 135 Ill. 2d 423, 447 (1990). There is no such probability here. The two statements made by Jamison were isolated comments made in the context of extended narrative testimony. Both statements were made in response to general inquiries by the State, and neither remark was elaborated upon in any way. Moreover, aside from Jamison’s testimony, the evidence of defendant’s guilt was overwhelming. Jacob Bollinger testified unequivocally that defendant attacked him and murdered his wife, JoAna. In statements given to the police, defendant confessed to the murder. DNA evidence strongly implicated defendant, and defendant was arrested with the murder victim’s rings on his person. Given this evidence, we do not believe that Jamison’s two remarks were a significant basis for defendant’s convictions. We hold, therefore, that even if Jamison’s two statements were hearsay, their admission was harmless error. Because we find no reversible error regarding Jamison’s testimony, we also find no plain error. See 
Keene
, 169 Ill. 2d at 17.

Dismissal of Venireperson Cox

Defendant argues that a prospective juror, Stanley Cox, was improperly dismissed for cause because of his views regarding the death penalty. Defendant maintains that, while Cox expressed some qualms about imposing a death sentence, his views on capital punishment would not have substantially impaired his performance as a juror. Thus, according to defendant, Cox’s dismissal for cause was unwarranted and defendant is entitled to a new sentencing hearing.

The initial questioning of venireperson Cox was done by the court. During this questioning, Cox stated that he would not automatically impose a death sentence, that he would listen to the evidence presented and instructions from the trial court, and that he could sign a death verdict. Cox was then questioned by the State along with other prospective jurors. One of the other potential jurors, Jackie Heap, indicated that she could never impose the death penalty. The following colloquy between the State and Cox then ensued:

“[State’s Attorney]: [Would you] be able to vote for the death penalty *** Mr. Cox?

JUROR [Cox]: I don’t know if I could.

[State’s Attorney]: Are you having some kinds of second thoughts here?

JUROR: Yeah, about the death penalty thing.

[State’s Attorney]: You were persuaded by Mrs. Heap over here?

JUROR: Well, it’s been on my mind since we–

[State’s Attorney]: Well, just kind of found out about it, I suppose?

JUROR: You know, everybody talks about it until when it comes up to it. This is it. I mean–

[State’s attorney]: Right. I guess I needed to ask you then, you think you probably could not impose the [d]eath [p]enalty?

JUROR: I don’t know.

[State’s Attorney]: And I know that you know [defense counsel] from the school board?

JUROR: I only saw his name. I have never met him personally. I just saw his name on something.

[State’s Attorney]: So that certainly doesn’t have anything to do with it?

JUROR: No.

[State’s Attorney]: You certainly think you may not be able to?

JUROR: It’s kinds [
sic
] of a religious thing.

[State’s Attorney]: Okay. That’s fine. You have some religious or moral beliefs against it?

JUROR: Yeah.”

Cox was subsequently questioned by defense counsel. Counsel asked Cox if “you don’t know whether you could sign that verdict or not?” Cox responded, “[m]ore or less, yeah, that would be about the same.” Counsel then asked Cox if “there could be a circumstance where you could go through and deliberate on the case and you may find that you could sign a verdict of death?” Cox replied, “Yes.” The State later moved to dismiss Cox for cause. Over the objection of defense counsel, the court allowed the challenge for cause.

A prospective juror in a capital case can be excused for cause when the juror’s views on capital punishment would “ ‘prevent or substantially impair the performance of duties as a juror in accordance with his instructions and his oath.’ ” 
Wainwright v. Witt
, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52, 105 S. Ct. 844, 852 (1985), quoting 
Adams v. Texas
, 448 U.S. 38, 45, 65 L.Ed. 2d 581, 589, 100 S. Ct. 2521, 2526 (1980). It is not necessary that a prospective juror express his views regarding the death penalty with “meticulous preciseness” before the trial court may rule on a motion to exclude for cause. 
People v. Tenner
, 157 Ill. 2d 341, 362 (1993). In addition, the remarks of a prospective juror during the 
voir dire
 examination must be considered “not in isolation but as a whole.” 
Tenner
, 157 Ill. 2d at 363. Because of the unique nature of each 
voir dire
, the standards for dismissing a juror for cause must be applied on a case-by-case basis. 
People v. Williams
, 161 Ill. 2d 1, 54 (1994).

Defendant’s argument regarding the dismissal of venireperson Cox centers upon the contention that the trial judge applied an improper standard in dismissing Cox for cause. Defendant notes that a venireperson may not be excused for cause simply because he voices general religious scruples against the infliction of the death penalty. According to defendant, in the case at bar, the trial judge focused solely on the existence of Cox’s religious concerns in allowing the State’s motion for dismissal. Thus, in defendant’s view, Cox’s dismissal was improper. We disagree.

When the State moved to dismiss Cox for cause, it also moved to dismiss another juror, Helen Stram. After listening to arguments, the trial court granted the State’s motion to dismiss Cox, but denied the State’s motion with respect to Stram. The court explained that Stram’s responses to questioning indicated that she had “more of a skeptical sort of view of the thing. She would require herself to be convinced in order to sign a–in order to sign a [d]eath penalty. I would hope all jurors would have such a belief. That it would [not] be something done lightly.” Cox’s position, however, which was based upon “religious perception,” was “different” from Stram’s. That difference, in the court’s view, justified dismissing Cox for cause.

The clear import of the trial judge’s statements is that, after observing Cox’s demeanor, and gauging his responses to questioning, the judge concluded that Cox would have been more than simply hesitant to impose the death penalty. Instead, the judge determined that, unlike Stram, Cox would not be able to fully put aside his concerns regarding capital punishment and follow the law and his oath in deciding what sentence to impose. We note, moreover, that other portions of the 
voir dire
 indicate that the judge understood the proper standard for dismissing prospective jurors for cause. For example, after moving to dismiss Cox, the State moved to dismiss for cause another potential juror, Christine Cirrincione, based upon what the State characterized as an “extreme reluctance” to impose the death penalty. Defense counsel objected to the motion, and expressly noted that a venireperson might have “moral and religious questions in their mind” about the death penalty, but that the inquiry must be on whether the juror could follow the law. The trial judge, after hearing these arguments, denied the motion to dismiss Cirrincione for cause. Considering the record as a whole, it is clear that the judge understood the law and applied the proper standard in dismissing venireperson Cox.

We have frequently noted that the trial judge “is in a superior position to determine from a prospective juror’s responses as a whole and the juror’s demeanor whether that individual’s views toward capital punishment would substantially prevent or impair the performance of his duties as a juror at the sentencing phase of the trial in accordance with the oath he is required to take.” 
Williams
, 161 Ill. 2d at 54. Because the trial court is in a “ ‘superior position to gauge the meaning of the prospective juror’s responses,’ ” its determination of the propriety of removal for cause of a prospective juror is entitled to great deference on review. 
Tenner
, 157 Ill. 2d at 363, quoting 
People v. Emerson
, 122 Ill. 2d 411, 439 (1987).

In the instant case, at times, Cox indicated that he could follow the law and perform his duty as a juror. On other occasions, however, his responses indicated that he could not clearly “set aside his own beliefs in deference to the rule of law.” 
Williams
, 161 Ill. 2d at 54, citing 
Lockhart v. McCree
, 476 U.S. 162, 176, 90 L. Ed. 2d 137, 149-50, 106 S. Ct. 1758, 1766 (1986). “[I]t is precisely in situations such as this, where the cold record suggests an apparent contradiction, that we defer to the circuit court’s discretion.” 
People v. Shaw
, 186 Ill. 2d 301, 317 (1998), citing 
People v. Holman
, 132 Ill. 2d 128, 148-49 (1989). The trial judge in the case at bar clearly determined that Cox would have problems performing his duties as a juror. Based upon the record before us, we cannot substitute our “speculations about [Cox’s] demeanor in place of the lower court’s personal observations.” 
Shaw
, 186 Ill. 2d at 318. Accordingly, we hold that the trial court did not err when it dismissed venireperson Cox for cause. See, 
e.g.
, 
Tenner
, 157 Ill. 2d at 359-63 (upholding the dismissal for cause of a prospective juror who stated that she had “a problem with the death penalty”).

Ineffective Assistance of Counsel at Sentencing

Defendant maintains that he received ineffective assistance of counsel at the aggravation-mitigation stage of sentencing because his attorney failed to introduce, as mitigating evidence, the testimony of Dr. Michael Gelbort. During defendant’s fitness hearing, Gelbort testified that he had examined defendant on two occasions, and that during these examinations, defendant had engaged in persistent delusional behavior. Gelbort also testified that defendant was not fit to stand trial. Defendant now contends that defense counsel’s mitigation evidence, which consisted solely of the testimony of defendant’s mother, could easily have been dismissed by the jury, and therefore was simply insufficient. According to defendant, the testimony of Gelbort should have been offered to the jury because of its obvious mitigating nature and because it likely would have made a difference in the outcome of the sentencing hearing.

In order to sustain a claim of ineffective assistance of counsel, defendant must show that trial counsel’s performance fell below an objective standard of reasonableness, and that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. 
Strickland v. Washington
, 466 U.S. 668, 687, 694, 80 L. Ed. 2d 674, 693, 698, 104 S. Ct. 2052, 2064, 2068 (1984) (adopted by this court in 
People v. Albanese
, 104 Ill. 2d 504, 525-26 (1984)). Defendant acknowledges that “counsel’s decision whether to present a particular witness is generally a strategic choice which cannot support a claim of ineffective assistance of counsel.” 
People v. Jones
, 144 Ill. 2d 242 (1991). Defendant maintains, however, that under the facts of this case, there can be no proper strategic justification for defense counsel’s failure to call Gelbort as a witness at the mitigation hearing. We disagree.

A principal issue contested during the fitness hearing was whether defendant was faking his psychological symptoms. The State’s expert witness, Dr. John Rabin, testified that malingering should be suspected when someone is charged with a crime or involved in litigation, and that it was possible that defendant was faking his symptoms. Delancy Moore’s testimony that defendant appeared coherent during disciplinary proceedings which took place in the county jail less than a month before the fitness hearing implicitly supported the State’s position that defendant was malingering. Gelbort was cross-examined at some length by the State regarding,
 inter alia
, his conclusion that defendant was not “gilding the lily.” In addition, during the State’s closing argument, the State explicitly argued that defendant was faking his psychological symptoms, stating, “This defendant or any other defendant can stair [
sic
] into space and start babbling words and start spouting psychobabble that anyone has seen on countless movies or countless talk shows where people have faked mental illness to avoid their day in court. And that is exactly what the defendant is doing.”

If defense counsel had introduced Gelbort’s testimony at the sentencing hearing, he would have also introduced the issue of whether defendant was malingering. In that event, the jury would have had before it for consideration not only the horrible nature of the crimes committed, and the State’s aggravating evidence, but also the issue of whether defendant was trying to avoid responsibility for his actions by feigning a psychological disorder. Given the outcome of the fitness hearing, and given the clear risks associated with introducing Gelbort’s testimony, we cannot hold that defense counsel’s conduct fell below an objectively reasonable standard when he failed to present that testimony during the aggravation-mitigation phase of the sentencing hearing. We hold, therefore, that defense counsel was not constitutionally ineffective for failing to call Gelbort to testify during the sentencing proceeding.

Judge’s Comment at Sentencing

JoAna Bollinger’s grandmother, Mailyn Stofleth, read a victim impact statement to the jury during the aggravation-mitigation stage of sentencing hearing. As Stofleth was leaving the stand, the judge stated, “I am sorry about your loss, ma’am.” Defendant contends that this comment denied him a fair sentencing hearing. The State initially maintains that this argument is procedurally defaulted because defendant failed to object to the judge’s statement during trial. However, the procedural default, or waiver, rule is not rigidly applied where the basis for the objection is the conduct of the trial judge. 
People v. Nevitt
, 135 Ill. 2d 423, 455 (1990), citing 
People v. Sprinkle
, 27 Ill. 2d 398, 400-01 (1963); 
People v. Smith
, 176 Ill. 2d 217, 237 (1997).

A trial judge has a duty to see that all persons are provided a fair trial. 
People v. Burrows
, 148 Ill. 2d 196, 250 (1992). Accordingly, a trial judge must refrain from interjecting opinions, comments or insinuations reflecting bias toward or against any party. 
People v. Garrett
, 276 Ill. App. 3d 702, 712 (1995). “Judicial comments can amount to reversible error if the defendant can establish that such comments were ‘a material factor in the conviction or were such that an effect on the jury’s verdict was the probable result.’ ” 
Burrows
, 148 Ill. 2d at 250, quoting 
People v. Harris
, 123 Ill. 2d 113, 137 (1988). We do not believe that the comment at issue here was a material factor in defendant’s sentence of death. The judge’s statement that he was “sorry about [Stofleth’s] loss” was merely a polite expression of condolence, and it did not reflect a bias for or against any party. See 
People v. Holman
, 132 Ill. 2d 128, 150 (1989) (no error where the trial judge told the jury the “sad news that [the State’s Attorney’s] mother passed away”). Accordingly, we find no basis for disturbing defendant’s sentence.

Closing Argument at Sentencing

During closing argument at the aggravation-mitigation stage of sentencing, the prosecutor stated: “You tell us whose life has more value. The innocent mother and wife, or this defendant who made his decisions?” Defendant argues that this statement was improper and that, as a result of this statement, he is entitled to a new sentencing hearing. Defendant concedes that no objection was made to this comment at trial and that the claim of error is therefore procedurally defaulted. Defendant also argues, however, that we may consider the error under the plain error doctrine. For the following reasons, we find no plain error.

“ ‘Any error related to *** comments to which no objections were made would normally be considered waived unless the comments were so inflammatory that defendant could not have received a fair trial or so flagrant as to threaten deterioration of the judicial process.’ ” 
People v. Kokoraleis
, 132 Ill. 2d 235, 283-84 (1989), citing 
People v. Albanese
, 104 Ill. 2d 504, 518 (1984). While we agree with defendant that the “whose life has more value” comment was improper, we cannot say that it was so improper as to warrant reversal of defendant’s sentence. Considered in the entirety of the context of the State’s closing argument, the comment did not deny defendant a fair sentencing hearing or threaten deterioration of the judicial process. Moreover, the jury was properly instructed that the evidence which it could consider consisted only of the testimony of the witnesses and the exhibits which the court had received. Consequently, we find no plain error.

Constitutionality of the Death Penalty Statute

Defendant argues that the Illinois death penalty statute is unconstitutional because it places a burden of proof upon defendants to show that mitigating evidence outweighs aggravating evidence, and because it permits the sentencer to consider a vague aggravating factor, namely, “any other reason” beyond the statutory factors why a defendant should be sentenced to death. See 720 ILCS 5/9–1(c), (e) (West 1994); Illinois Pattern Jury Instructions, Criminal, No. 7C.06 (3d ed. 1992). This court has previously rejected both of these contentions. 
People v. Taylor
, 166 Ill. 2d 414, 439 (1995) (and cases cited therein). We decline to depart from our prior holdings on these issues.

Defendant also asserts that the death penalty is unconstitutional because it fails to sufficiently minimize the risks that death sentences will be arbitrarily and capriciously imposed. This contention has also been rejected by this court (see, 
e.g.
, 
Taylor
, 166 Ill. 2d at 440), and we decline to revisit our holdings on this issue.

CONCLUSION

For the foregoing reasons, the judgment of the circuit court of St. Clair County is affirmed. The clerk of this court is directed to enter an order setting Thursday, November 16, 2000, as the date on which the sentence of death entered in the circuit court is to be carried out. Defendant shall be executed in the manner provided by law. 725 ILCS 5/119–5 (West 1996). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Tamms Correctional Center, and to the warden of the institution where defendant is now confined.

Judgment affirmed
.

JUSTICE RATHJE, specially concurring:

I agree with the majority that defendant’s convictions and death sentence should be affirmed. I write separately, however, because I disagree with the majority’s analysis of defendant’s probable cause argument.

In deciding whether the trial court properly denied defendant’s motion to suppress statements, the majority comprehensively examines the question of whether probable cause existed for defendant’s warrantless arrest. The majority’s analysis includes a review of the testimony from the motion hearing, a survey of probable cause jurisprudence, and even a brief tutorial in “basis of knowledge” principles. None of this is necessary, however, as defendant did not even attempt to meet his burden of proving that his arrest was unlawful.

In Illinois, a defendant who seeks to suppress evidence based upon an unlawful search or seizure bears the initial burden of proving that the arrest in fact was unlawful. 725 ILCS 5/114–12(b) (West 1998); 
People v. Buss
, 187 Ill. 2d 144, 204 (1999); 
People v. Kidd
, 175 Ill. 2d 1, 22 (1996). In other words, the defendant must make a 
prima facie
 showing both that the police acted without a warrant and that the police lacked probable cause, lacked reasonable grounds to arrest the defendant, or had no reasonable or articulable suspicion of criminal activity that would warrant an investigative stop. 
People v. Culbertson
, 305 Ill. App. 3d 1015, 1023 (1999); 
People v. Ertl
, 292 Ill. App. 3d 863, 868 (1997).

In this case, defendant did not present 
any
 evidence at the motion to suppress hearing to establish that his arrest was unlawful. In fact, defendant did not present any evidence 
whatsoever
. On the contrary, the State called two police officers to testify briefly as to their arrest of defendant and at length as to their interrogation of defendant. Defendant confined his cross-examination to the interrogation, and he rested without presenting any of his own witnesses or introducing any of his own evidence. Whether the defendant was arrested without a warrant never came up, and defendant did not even attempt to establish that the police lacked probable cause, lacked reasonable grounds to arrest the defendant, or had no reasonable or articulable suspicion of criminal activity that would warrant an investigative stop. Consequently, the majority need not decide whether the State met its burden of proving probable cause, as defendant failed to make the requisite 
prima facie 
case.

Defendant’s complete failure to meet his burden of proof on the probable cause question is easily understood when one realizes that defendant was not moving to suppress his confession as the fruit of an unlawful arrest. Rather, an examination of the motion, the motion hearing, and the trial court’s ruling on the motion demonstrates that defendant was moving to suppress his confession 
as involuntarily made
. To be sure, defendant’s motion briefly  asserts that “The defendant was arrested without a warrant and without probable cause.” The remaining seven paragraphs of the motion, however, argue that defendant’s confession was involuntarily made. Likewise, although the State briefly asked the police officers about defendant’s arrest, virtually all of the direct examination and literally all of the cross-examination dealt with the interrogation that led to defendant’s confession. In fact, of the 64 pages of transcript from the hearing on defendant’s motion to suppress, 58 relate to the interrogation and 6 relate to the arrest. Finally, the trial court’s written order denying defendant’s motion to suppress makes numerous factual findings relating to the voluntariness of defendant’s confession, no findings on the question of probable cause, and concludes that “the totality of the circumstances support a finding that the defendant’s statement was voluntary and made with 
Miranda
.” Neither defendant nor the State requested a ruling on the existence of probable cause.

More importantly, the manner in which the parties proceeded at the motion hearing demonstrates that both defendant and the State were litigating a motion to suppress statements as involuntarily made, not a motion to suppress statements as the fruit of an unlawful arrest. Again, a defendant moving to suppress statements based upon an unlawful arrest clearly bears the initial burden of proving that the arrest was unlawful. 725 ILCS 5/114–12(b) (West 1998); 
Buss
, 187 Ill. 2d at 204. Despite bearing this burden, defendant presented no evidence 
whatsoever
. However, when a defendant moves to suppress statements as 
involuntarily made
, the State bears the burden of proving by a preponderance of the evidence that the confession was voluntary. 725 ILCS 5/114–11(d) (West 1998); 
People v. Woods
, 184 Ill. 2d 130, 146 (1998). In this case, the State alone presented evidence at the motion to suppress hearing, virtually all of which related to the voluntariness of defendant’s confession. Moreover, defendant’s cross-examination related solely to the voluntariness of his confession, and defendant rested without putting on a case. The only way this makes sense is if the parties were litigating a motion to suppress statements as involuntarily made, 
not
 a motion to suppress statements as the fruit of an involuntary search.

Although the majority’s decision to address the probable cause question is troubling in and of itself, even more troubling is the majority’s conclusion that the State met its burden. The State never tried to prove probable cause. The majority goes to great and tenuous lengths to demonstrate that defendant’s presence in the area several hours after the arrest, combined with Kathy Kunkle’s baseless identification, amounts to probable cause. Clearly it does not. This does not necessarily mean, however, that the police lacked probable cause when they arrested defendant. It simply means that the question of probable cause was never litigated.

In sum, defendant argues that the trial court should have suppressed his confession as the fruit of an unlawful arrest. Defendant failed to meet his burden on this issue, as he never litigated it. The only issue that defendant litigated is whether his confession was voluntary, and he chose not to raise that issue on appeal.

The trial court’s denial of defendant’s motion to suppress should be affirmed.

CHIEF JUSTICE HARRISON, concurring in part and dissenting in part:

I agree that Sims’ convictions should not be disturbed.  In my view, however, his sentence of death cannot be allowed to stand. For the reasons set forth in my dissent in
 People v. Bull
, 185 Ill. 2d 179 (1998)
, the Illinois death penalty law violates the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV) and article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, §2).  Sims’ sentence of death should therefore  be vacated, and the cause should be remanded for imposition of  a  sentence of imprisonment.  720 ILCS 5/9–1(j) (West 1994).

FOOTNOTES
1:     
1
The record contains several different spellings of JoAna Bollinger’s first name. We defer to the spelling which appears in the victim impact statement prepared by JoAna Bollinger’s grandmother.