7 July 1999

No. 2--97--0713

_________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_________________________________________________________________

THE PEOPLE OF THE STATE OF ) Appeal from the Circuit Court

ILLINOIS, ) of Lake County.

)

Plaintiff-Appellee, )

) Nos. 96--CF--3407

) 96--CF--3583

) 96--CF--3585

) 96--CF--3598

)

JAY V. CULBERTSON, ) Honorable

) James K. Booras,

Defendant-Appellant. ) Judge, Presiding.

_________________________________________________________________

JUSTICE THOMAS delivered the opinion of the court:

Defendant, Jay V. Culbertson, was charged in a multicount indictment with nine burglary offenses, which were tried concurrently in four separate cases before a jury.  Defendant was convicted on all nine counts and was sentenced to concurrent sentences of 24 years' imprisonment.  On appeal, defendant contends that his convictions should be reversed and the case remanded for a new trial because the trial court erred in denying defendant's motions to quash his arrest and suppress evidence and to suppress an unsigned typed statement.

The facts relevant to this appeal are as follows.  Defendant was indicted along with Mark Didier and Shawn Lewey for nine counts of burglary to various businesses in Lake County.  Prior to trial, defendant filed a motion to quash arrest and to suppress his confession in all of the cases.  At the hearing on defendant's motion to quash his arrest and to suppress his statement, Detective Robert Maze of the Lake County sheriff's police testified that since October 1, 1996, he has been assigned to the Repeat Offenders Strike Force (ROPE) in Lake County.  Maze said that a variety of investigators began to meet to discuss problems with commercial and business burglaries.  In the latter part of October 1996, the group met with Detective Gary Bitler of the Round Lake Beach police department.  Detective Bitler informed the group that a confidential informant had told him that defendant was the prime suspect in the burglaries, that the burglaries were done following rear entry of the businesses with a crowbar or a pry tool, that the burglaries involved commercial or strip mall sites, that the burglars drove to the strip mall but approached the target businesses on foot, and that the burglars might be armed with handguns during the commission of the burglaries.  

Maze testified that ROPE then developed more information on the defendant, learning the make and model of his car, a 1988 two-door gray Chevrolet Beretta.  The group also determined defendant's last known address in Gages Lake, Illinois, and learned his current address in Gurnee, Illinois.  The group conducted two or three surveillance operations on defendant in the five or six weeks between the time that they talked with Detective Bitler and November 29, 1996.  On November 29, 1996, two separate teams began surveillance of defendant at around 4 p.m.  Maze and Detective Hansen of the Mundelein police department conducted surveillance of defendant's last known address and observed a maroon Saturn belonging to defendant's girlfriend in the driveway, and another team conduced surveillance of defendant's current address.  Maze said that between 9:30 and 9:45 p.m., he and Hansen saw a man and a woman get into the maroon Saturn and drive to defendant's current residence.  The man and the woman went into the building, and several minutes later a man came out of the building and got into defendant's Beretta.  Maze and Hansen followed the car to a Denny's restaurant, where an agent confirmed that the individual in the Beretta was defendant.  Maze testified that at this point he knew that defendant had prior arrests for burglary and had been in prison twice.  

Defendant went into the Denny's restaurant and sat with two other men.  The three men then left the restaurant in defendant's car.  Around 10 to 12 officers followed defendant for 30 to 45 minutes, keeping in contact with one another via radio.  Around 10:30 p.m., the car pulled into a strip mall in Buffalo Grove known as Woodland Commons.  There were at least a dozen stores in the strip mall, but only a Dominick's grocery store was open.  Defendant's car drove slowly from one end of the mall to the other and then back.  The car then pulled into the street and drove toward the back of the Dominick's store.  At that point, Maze could no longer see defendant's car, but the other officers said that it was crisscrossing side streets behind the strip mall.  Detective Maze, followed by Sergeant Robert Kerkorian of the Waukegan police department, drove to the first street behind the strip mall, and both men got out of their cars.  Maze was wearing jeans, a dark shirt, and a bulletproof vest and had his gold detective shield on his vest along with his service weapon and his handcuffs.  Maze began putting on a jacket to cover his equipment and, as he and Kerkorian were walking up a driveway, they saw defendant's car coming down the street.  Sergeant Kerkorian said, "They just made us."  Maze heard defendant's car accelerate and leave the area at a high rate of speed.  Maze and Kerkorian then got back into their cars and told the other officers what had happened. 

Defendant's car eventually was stopped in Libertyville by two Libertyville police officers.  Maze testified that there were three individuals in the car and that he recognized defendant sitting in the front passenger seat.  Maze pointed his service weapon at defendant, then put it down to his side, opened defendant's door, identified himself as a police officer, and ordered defendant out of the car.  Maze instructed defendant to put his hands on the roof of the car and patted him down for weapons.  By this time, the other individuals were out of the car and had been patted down for weapons.  Maze told defendant that he was a police officer and that several officers had been conducting surveillance of him throughout the evening because he had been targeted as the prime suspect in a burglary investigation.  Maze also verbally advised defendant of his 
Miranda
 rights.  Defendant then gave Maze consent to search the inside and the trunk of his car.  Maze's search of the trunk revealed a box of tools, a two-foot long crowbar, and a black .45- caliber pellet gun.  At this point, defendant had not been told that he was under arrest.

On cross-examination, Maze said that he did not ask Detective Bitler about the confidential informant's reliability.  He also said that defendant's car was pulled over in part because of its speed but that it was not pulled over for a traffic offense.  On redirect examination, Maze explained that, in addition to the car's speed, the officers had stopped defendant's car based upon what they had seen that evening.  Defendant's car drove to a strip mall, which was the same type of strip mall that had been experiencing a lot of burglaries.  Further, there were three individuals in defendant's car, and the officers had been told that three individuals were committing the burglaries.  Also, the route taken by defendant and his companions was similar to what the detectives had been told about the route used by the suspects in the burglaries. 

At the close of Detective Maze's testimony, defendant argued that there was no probable cause for his arrest, that the arrest should be quashed, and that all evidence seized as a result of the arrest should be suppressed.  The State responded that the stop was a permissible 
Terry
 stop.
  The trial court held that it was clear that defendant and the others were casing the strip mall and then spotted Maze and Kerkorian and sped away.  The trial court also held that Detective Maze was justified in drawing his weapon initially based upon the information that the suspects might be armed and noted that Maze's gun was holstered as soon as the officers determined that the individuals were not armed.  Further, the trial court noted that the search of defendant's trunk was based on consent.  The trial court therefore held that the initial stop was a 
Terry
 stop and, upon finding the pellet guns in the trunk, the officers' reasonable articulable suspicion developed into probable cause.  The trial court therefore denied defendant's motion to quash his arrest.

A hearing then was held on defendant's motion to suppress his statement.  Six officers testified concerning the events surrounding defendant's statement.  Officer John Ward testified that he is a Gurnee police officer and also is a member of ROPE.  Ward said that late in the evening of November 29, 1996, and into the morning of November 30, 1996, he had a conversation with defendant in an interview room at the Waukegan police department.  Ward said that Sergeant Kerkorian also was present during the conversation and that Kerkorian read defendant his 
Miranda
 rights, following which defendant signed the 
Miranda
 form.  Ward said that he left the interview room shortly after defendant was read his rights but that defendant did not ask to speak with an attorney and did not say that he wished to remain silent.

Officer Charles Kehr testified that he is employed by the Zion police department and also is assigned to ROPE.  Around 2:45 a.m. on November 30, 1996, Kehr, along with Sergeant Kerkorian, conducted an interview of defendant that lasted around 45 minutes.  Kehr said that it was a very "low-key" interview.  During the interview, defendant never asked to speak to an attorney and never refused to answer any questions.  Kehr said that at first defendant did not answer any questions and instead just listened to Kehr and Kerkorian talk.  Later, Kehr typed up a statement that defendant refused to sign.

Investigator Joseph Bronge of the Mundelein police department testified that around midnight on November 29, 1996, he went to the Waukegan police department to meet with other officers from other departments concerning suspects that had been picked up in a burglary investigation.  Around 4:25 a.m. on November 30, 1996, Detective Kehr took Bronge to the interview room and introduced him to defendant.  Bronge spoke to defendant for around 20 minutes.  Defendant never asked to speak to an attorney and never asked to remain silent.  On cross-examination, Bronge said that Kehr had told him that defendant had received his 
Miranda
 warnings and had agreed to speak to the officers.  

Officer Todd Williams of the Village of Vernon Hills police department testified that on November 30, 1996, he went to the Waukegan police department around 4 a.m.  Williams and Detective Bell from the Libertyville police department interviewed defendant around 5:30 a.m.  Williams and Bell told the defendant why they were there and verbally gave defendant his 
Miranda
 rights, which he waived.  Williams interviewed defendant first, and then Bell interviewed defendant.  During the interviews, defendant never asked for an attorney and never said that he did not want to talk to the officers.  Defendant, however, told the officers that he would not write a statement and would not agree to give a taped statement.  

Detective Craig Sommerville of the Antioch police department then testified that he arrived at the Waukegan police department at 4:30 a.m. on November 30, 1996.  At 8:37 a.m., Sommerville and Officer Mason from the Fox Lake police department interviewed defendant.  The first thing that Sommerville did upon arriving in the interview room was to advise defendant of his 
Miranda
 rights and give defendant a waiver sheet to read and sign.  Sommerville then interviewed defendant for around 20 minutes concerning strip mall burglaries in Antioch.  During the interview, defendant never asked to speak to an attorney and never said that he did not want to talk anymore.  

The next witness was Sergeant Kerkorian.  Kerkorian said that he interviewed defendant on November 30, 1996, beginning around 1:55 a.m.  Kerkorian read defendant his 
Miranda
 rights, defendant indicated that he understood those rights, and defendant then signed the 
Miranda
 form.  Kerkorian said that defendant never asked for an attorney, never said that he did not want to be questioned anymore, and never said that he wanted to remain silent.  

Defendant then testified that on the night of November 29, 1996, and into the morning of November 30, 1996, he was interviewed by a succession of police officers at the Waukegan police department.  Defendant said that Detectives Kerkorian and Ward read him his 
Miranda
 rights and that he then signed the 
Miranda
 form.  Defendant testified that around 1:45 a.m. Detectives Kerkorian and Ward started questioning him about some burglaries and said he told the detectives that he did not want to talk to them.  Defendant also said that at 1:55 a.m. he told Kerkorian that he did not want to answer any questions and that he wanted his lawyer present.  Defendant claimed that Kerkorian told him that he did not need a lawyer because he was not under arrest and instead was there for voluntary questioning.  Defendant said that Ward and Kerkorian left the room; then Kerkorian returned with Detective Kehr.  Defendant again told the detectives that he did not want to talk to them and that he wanted an attorney present while they questioned him.  The detectives continued to question defendant and he refused to answer any of their questions.  Defendant claimed that when each team of police officers came in to interview him, he told them that he was not going to answer any questions and would not give a written or a taped statement, but the officers continued to question him.

Following the hearing, the trial court denied defendant's motion to suppress his statement, stating that it did not find defendant to be credible.  The trial court then ruled on defendant's motions 
in
 
limine
.  One motion 
in
 
limine
 sought to exclude defendant's typed statement on the ground that the document was not signed by defendant.  Defendant argued that the statement was no more than a police report, which was not admissible at trial.  The trial court denied defendant's motion, stating that, because defendant had some input into the document and had initialed the document, defendant thereby had adopted the document.  Accordingly, the court held that the document was admissible.  

At defendant's trial, the officers that testified at defendant's motion to quash arrest and to suppress his statement again testified to the events surrounding defendant's arrest.  The owners or employees of the various businesses that had been burglarized also testified.  In addition, Mark Didier and Shawn Lewey, who had been arrested and indicted along with defendant, each testified against defendant.  Didier and Lewey testified that they had committed burglaries with defendant at the nine businesses for which defendant was on trial, as well as other businesses.  

Sergeant Kerkorian then testified concerning defendant's statement.  Kerkorian stated that defendant described how he had done each burglary and said that he had just gotten married and needed the money to support his family.  Defendant told Kerkorian that he chose strip malls because they usually have less security than larger chains and because the stores usually keep cash on hand for the next day's business.  In addition, defendant explained that strip malls usually have alleys behind them so a person can come and go without being seen.  Defendant said that he would drive by the front of the stores and count the doors so that he could locate the stores from the back.  Defendant and Didier wore masks and gloves during most burglaries, and they used a crowbar and screwdriver during every burglary.  Kerkorian said that Detective Kehr then typed defendant's statement on Kerkorian's computer and read the typed statement to defendant.  Defendant made corrections to the second page of the statement either by inserting letters or crossing out words, and then he initialed the corrections.  Defendant told Kerkorian and Kehr that the statement was true and correct but said that he would not sign the statement.  Defendant did agree to initial the front page of the statement.  Over defendant's objection, the trial court allowed the typed statement into evidence.  

As noted, the jury found defendant guilty on each charge of burglary.  The trial court denied defendant's motion for a new trial and his 
pro
 
se
 motion for a new trial and sentenced him to concurrent terms of 24 years' imprisonment in the Illinois Department of Corrections.  This timely appeal followed.

On appeal, defendant first contends that the trial court erred in denying his motion to quash his arrest and to suppress evidence.  Defendant claims that there was no probable cause to stop him and further argues that the police officers' actions in stopping him constituted an arrest.  Defendant notes that the officers admitted that they had not observed any traffic violations or illegal conduct, that they had their weapons drawn when defendant was ordered out of the car, and that the officers conducted a pat down search of defendant and the two men with him.  In addition, defendant claims that the information concerning defendant's involvement in the burglaries provided to Detective Bitler by the confidential informant was insufficient to provide probable cause that a crime had been or was being committed.  Defendant contends that this court should reverse the trial court's ruling denying defendant's motion to quash his arrest.  Defendant also notes that, because his motion to quash arrest had been denied by the trial court, he never argued that his statement should be suppressed as the fruit of the unlawful arrest.  On appeal, defendant maintains that, in addition to reversing the denial of defendant's motion to quash, this court also should grant defendant's motion to suppress his statement on the basis that it was the fruit of his unlawful arrest.

 In response, the State argues that the officers' initial investigatory stop of defendant was a proper 
Terry
 stop.  The State further argues that, although the officers began their investigation of defendant based upon information from a confidential informant, the officers corroborated that information through their investigation of defendant as well as the surveillance of defendant on the night he was arrested.  The State also contends that the officers properly drew their weapons upon stopping defendant because they had information that defendant and his companions were armed.  Finally, the State notes that the defendant had given verbal consent to search the trunk of his car, which produced more evidence that, combined with the information the officers possessed, gave rise to probable cause to arrest defendant.  

A trial court's ruling on a motion to quash or to suppress will not be overturned on review unless that ruling is against the manifest weight of the evidence.  
People v. Scott
, 249 Ill. App. 3d 597, 601 (1993).  As the movant, the defendant has the burden of proof to establish that a search and seizure was unlawful or impermissible; therefore, he must make a 
prima
 
facie
 case that the police lacked probable cause, lacked reasonable grounds to arrest the defendant, or had no reasonable or articulable suspicion of criminal activity that would warrant an investigative stop.  
Scott
, 249 Ill. App. 3d at 600.  

In 
Terry v. Ohio
, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), the United States Supreme Court recognized a limited exception to the probable cause requirement, which, under appropriate circumstances and in an appropriate manner, allows a police officer to briefly detain a person for investigatory purposes and also, if necessary for safety, to conduct a limited protective search of that person for concealed weapons.  
In re J.J.
, 183 Ill. App. 3d 381, 384 (1989).  
An officer may make a valid 
Terry
 stop if, based upon all the facts and circumstances, he had a reasonable and articulable suspicion that the suspect is committing, has committed, or is about to commit a crime.  
People v. Ertl
, 292 Ill. App. 3d 863, 868 (1997).  An objective standard applies to a review of a 
Terry
 stop, so a police officer must be able to point to specific and articulable facts that, taken together with the rational inferences from those facts, reasonably warrant the stop.  
People v. Long
, 99 Ill. 2d 219, 228 (1983).  Facts and circumstances that, if viewed independently, might constitute innocent behavior may provide reasonable suspicion when considered in their entirety to justify a 
Terry
 stop.  
People v. Crest
, 188 Ill. App. 3d 768, 773 (1989).  The 
Terry
 principles now have been codified in our Code of Criminal Procedure of 1963.  725 ILCS 5/107--14 (West 1996).

As noted, defendant argues that the stop in this case was not a proper 
Terry
 stop because the police stopped him based upon information supplied by a confidential informant which had not been corroborated.  A lawful 
Terry
 stop may be based on information received from an informant, but the information must bear some indicia of reliability and must be sufficient to establish the requisite quantum of suspicion.  
Ertl
, 292 Ill. App. 3d at 869.  A totality of the circumstances approach is applied to determine whether the information available to the police had a sufficient degree of reliability to sustain a finding of a reasonable and articulable suspicion for the stop.  
Ertl
, 292 Ill. App. 3d at 869.  An officer's independent corroboration of specific details provided by an anonymous tipster may establish that the informant had access to reliable information and may give rise to a reasonable suspicion that would justify a 
Terry
 stop.  
Adams v. Williams
, 407 U.S. 143, 147-48, 32 L. Ed. 2d 612, 617-18, 92 S. Ct. 1921, 1923-24 (1972).   Upon reviewing the testimony in this case and considering the totality of the circumstances, we agree with the trial court that the stop in this case was a proper 
Terry
 stop.  
The confidential informant told Detective Bitler that defendant was the prime suspect in a series of burglaries to businesses in Lake County; that the burglaries were done using a crowbar or a pry tool to the rear entry of the businesses, which were located in strip mall sites; that the burglars drove to the strip malls but approached the target businesses on foot; and that the burglars might be armed with handguns during the commission of the burglaries.  While there was no evidence concerning the reliability of the confidential informant, so the information supplied by the informant on its own might not justify an investigatory stop, the police officers in this case, contrary to defendant's claim, did in fact corroborate the details provided by the informant.

The officers conducted surveillance on defendant several times, learned the make and model of his car, learned his prior and current address, and also learned that defendant had prior arrests for burglary and had been in prison twice.  During the surveillance of defendant on November 29, 1996, the officers followed defendant and two others in defendant's car; they observed defendant's car proceed into a strip mall where only one store was open and slowly  travel from one end of the mall to the other and back.  Defendant's car then went behind the strip mall, and, when the occupants of the car spotted Detective Maze and Sergeant Kerkorian, the car accelerated and sped away.  

The test for a reasonable suspicion necessary to justify an investigative stop is less exacting than that for probable cause, and reasonable suspicion may arise when an officer has not observed a violation of the law as long as the officer can point to specific, articulable facts that warrant the stop.  
Scott
, 249 Ill. App. 3d  at 601.  Moreover, under certain circumstances, flight from an identifiable police officer may be sufficient to justify an investigatory stop.  
People v. Holdman
, 73 Ill. 2d 213, 221 (1978).  We find that the facts observed by the police officers in this case, including the fact that defendant's car sped away when the occupants spotted Maze and Kerkorian, along with the information from the informant, and the reasonable inferences drawn therefrom created a reasonable suspicion that defendant and the occupants of his car were about to commit a crime.  Accordingly, the officers were justified in stopping defendant's car for investigatory purposes under 
Terry
. 

Further, in concluding that the stop in this case was a proper 
Terry
 stop, we disagree with defendant that the stop constituted an arrest because the officers approached the car with their guns drawn and conducted a pat down search.  As discussed, an officer conducting a 
Terry
 stop may conduct a reasonable search for weapons when he has a reasonable belief that the person is armed and dangerous.  
Terry
, 392 U.S. at 24, 30 L. Ed. 2d at 908, 88 S. Ct. at 1881.  To justify a protective frisk, an officer need only show that it was more probable than not that the person possessed an instrumentality to commit bodily harm.  
People v. Washington
, 205 Ill. App. 3d 452, 456 (1990).

Here, the officers had been told that the burglars might be armed with handguns.  In a similar case, where police officers had been told by a confidential informant about a cocaine dealer and also had been told that the dealer had a gun in the trunk of his car, the officers' actions in approaching the dealer with their guns drawn and conducting a pat down search did not convert the officers' investigatory stop into an arrest.  
Washington
, 205 Ill. App. 3d at 456.  In this case too, we determine that, in light of the information that the burglars might be armed with handguns, the officers properly approached defendant's car with their guns drawn and properly conducted a pat down search of defendant and his two companions as part of their investigatory stop.  We note, as did the trial court, that the officers holstered their guns once it was determined that defendant and his companions were unarmed.  Consequently, the officer's actions did not convert the stop into an arrest.  

We also find the cases cited by defendant in support of his appeal to be distinguishable.  For example, in 
People v. Gabbard
, 78 Ill. 2d 88 (1979), the supreme court held that the defendant's motion to suppress should have been granted because a police officer could point to no reason for stopping the defendant other than the fact that the defendant was walking along the shoulder of a highway.  Here, in contrast, the police officers did point to specific, articulable reasons for stopping defendant.  Likewise, the decision in 
People v. Adams
, 131 Ill. 2d 387 (1989), also is not on point because the issue in that case concerned whether there was probable cause for a warrantless arrest, not whether the stop of the defendant constituted a valid 
Terry
 stop.

Under the circumstances of this case, then, the initial stop of defendant's car was a reasonable 
Terry
 stop.  Consequently, the trial court properly denied defendant's motion to quash his arrest and to suppress evidence.  In addition, because we find that the trial court properly denied defendant's motion to quash his arrest, we need not address defendant's claim that his statement should be suppressed as the fruit of his illegal arrest.

Defendant's second issue on appeal is that the trial court erred in admitting into evidence the typed statement prepared by Officer Kehr, which defendant refused to sign.  Defendant claims that the statement is hearsay and merely constitutes Officer Kehr's summary of defendant's oral statement, which is not admissible.

In an analogous case, the Appellate Court, Fourth District, considered whether a signed statement, which was a paraphrase of a defendant's oral statement, was admissible even though the defendant claimed he had not read the statement.  
People v. Davis
, 166 Ill. App. 3d 1016, 1019 (1988).  In deciding that issue, the court noted that an unsigned written statement prepared by someone other than a defendant may be admitted into evidence where the person who wrote the statement testifies that it is an accurate transcript of the defendant's oral remarks.  
Davis
, 166 Ill. App. 3d at 1018, citing 
People v. Perkins
, 17 Ill. 2d 493, 500 (1959); 
People v. Berryman
, 13 Ill. 2d 229, 231 (1958); 
People v. Dogoda
, 9 Ill. 2d 198, 202 (1956); 
People v. Wilson
, 92 Ill. App. 3d 370, 379-80 (1981).  Likewise, the court noted that a statement written by someone other than the defendant may be admissible if the defendant read the statement or the statement was read to the defendant, and he then signed it, thereby adopting its contents.  
Davis
, 166 Ill. App. 3d at 1019, citing 
People v. Williams
, 26 Ill. 2d 190 (1962); 
People v. Shelton
, 388 Ill. 56 (1944); 
People v. Guertin
, 342 Ill. 99 (1930); 
People v. Gukouski
, 250 Ill. 231 (1911).  Although the cases cited by the court in 
Davis
 addressed statements that were transcripts of the defendant's oral statement, the court concluded that, based upon those cases, "once the State has established by the officer's testimony a proper foundation concerning the creation of the written [paraphrased] statement, defendant's reading of it or it being read to him and defendant's signing of the statement, it becomes admissible."  
Davis
, 166 Ill. App. 3d at 1021.  The court held that any questions concerning the statement were for the trier of fact to resolve in determining the weight to be given the statement.  
Davis
, 166 Ill. App. 3d at 1021.

Here, as in 
Davis
, the statement at issue is a paraphrase of defendant's oral statement.  This case differs from 
Davis
 in that 
defendant in this case does not deny reading the statement but did refuse to sign the statement.  Although the issue in this case differs somewhat from the issue in 
Davis
, we believe the reasoning in 
Davis
 and the cases cited therein apply to this case.  

In this case, Sergeant Kerkorian and Officer Kehr testified concerning the creation of the written statement, testified that the statement was read to defendant and that defendant acknowledged that the statement was a true and correct statement, and testified that defendant made corrections to the statement and initialed it.  Accordingly, a proper foundation was established concerning the creation of the statement.  Further, the trial court properly found that defendant had adopted the statement when he corrected and initialed the statement after it was read to him.  Under the circumstances, we find that the statement was properly admitted into evidence, and, as in 
Davis
, hold that any questions concerning the fact that defendant refused to sign the statement were properly for the trier of fact to resolve in determining the weight to be given the statement.  Accordingly, we affirm the trial court's ruling allowing the statement into evidence.

For all the foregoing reasons, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

GEIGER and HUTCHINSON, JJ., concur.