2020 IL App (2d) 18-0910-U
No. 2-18-0910
Order filed May 4, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Lake County. |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 18-CF-235 |
| | ) | |
| JOVAN MARTIN, | ) | Honorable |
| | ) | Mark L. Levitt, |
| Defendant-Appellee. | ) | Judge, Presiding. |

JUSTICE BRENNAN delivered the judgment of the court.
Presiding Justice Birkett and Justice Hudson concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court erred in granting defendant's motion to quash arrest and suppress evidence where it found that the officer's display of a weapon and command to show hands converted a valid *Terry* stop into a warrantless arrest without probable cause.  The anonymous call to a recorded police non-emergency phone line indicating a possible drug transaction where one of the participants displayed a weapon to scare away the caller provided reasonable suspicion to conduct a *Terry* detention and investigation.  Further, concern over the suspect's use of a weapon and the other circumstances rendered reasonable the officer's display of a weapon and order to place hands out of car to facilitate said investigation, and did not constitute an arrest without probable cause.  Reversed and remanded for further trial proceedings.

¶ 2    An investigation following an anonymous call to a police non-emergency phone line resulted in the arrest of defendant, Jovan Martin, who was charged by indictment with one count of armed habitual criminal (720 ILCS 5/24-1.7(a)(1) (West 2018)), two counts of aggravated unlawful use of a weapon (enhanced) (720 ILCS 5/24-1.6(a)(1)(3)(A-5), (C) (West 2018)), and one count of unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2018)). Defendant filed a motion to quash arrest and suppress evidence. While the circuit court of Lake County found that the anonymous tip was sufficiently reliable and provided reasonable suspicion to justify an investigation pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), it granted defendant's motion because it found that the officer's initial display of a weapon and command to show defendant's hands otherwise constituted a warrantless arrest without probable cause. The State filed a certificate of impairment and appeals, arguing that the officers' actions in affecting the *Terry* stop were permissible given the report of a weapon, and that these actions did not constitute a warrantless arrest without probable cause. For the following reasons, we reverse and remand.

¶ 3                                I. BACKGROUND

¶ 4    The following evidence was introduced at defendant's motion to quash arrest and suppress evidence hearing.

¶ 5    On the morning of January 30, 2018, an individual called the non-emergency phone line of the Park City police department that was forwarded to a public safety dispatcher at FoxComm, which was recorded and played at the hearing. During the recorded conversation, the caller indicated he wanted to see if there was an officer near the Colonial Park Apartments. He stated he was walking back from a store to a building in the complex when he cut across a parking lot at the complex. He observed two black males in an older model white Audi on Knight Street in front of one of the Colonial Park Apartments buildings. He saw them engage in a hand-to-hand transaction

that he thought might have been a drug deal, but he was not certain. One of the men was wearing a tan jacket. Upon seeing the caller, one of the men "brandished a gun" that was located in the waist of his pants as if to say, "get away, mind your own business." The handle of the gun was black. The caller then saw the men enter one of the Colonial Park Apartment buildings in front of where the white Audi was parked. The caller indicated he took a picture of the Audi license plate and provided the plate number to the dispatcher. The caller indicated he did not wish to speak with a police officer, but that the car was still present at the location. The dispatcher told the caller she would send an officer.

¶ 6    The dispatcher relayed the particulars of the call to Officer Spencer Jurney of the Park City police department. Although there is no direct evidence of exactly how long it took the officers to respond, the State argued that the municipality was small, and the police presumably responded within a short time of the dispatch. The Park City police non-emergency line did not have caller identification, and the caller was never identified.

¶ 7    Officer Jurney testified that he drove to the specific location as directed, arriving there around 10:55 a.m. He was in a fully marked squad car and in uniform. Jurney was aware that the caller was anonymous, that he had reported two black males standing in front of a white car engaged in a drug deal and that one wore a tan coat. Jurney understood it was the suspect in the tan coat who had revealed the butt end of a gun in his waistband. Upon arrival he noticed the white car with exhaust coming out of the back at the location provided by the caller. He pulled up to the front of the car and saw one black male, who was wearing a tan coat, alone in the car sitting in the driver's seat. Commander Kenneth Stoves arrived at the same time in a separate vehicle. The police vehicles did not box in the white car.

¶ 8     Both officers exited their vehicles simultaneously. Stoves approached the driver's side door of the vehicle with his gun holstered while Jurney covered him a few feet behind with his gun drawn and pointed at the car. Jurney loudly ordered the suspect, later identified as defendant, to show his hands. Defendant rolled down his window as the officers approached and showed his hands. Officer Jurney smelled an odor of cannabis coming out of the vehicle. At this point, Stoves told defendant to exit the car, and defendant was slow to do so, asking why. Stoves told defendant they were investigating a drug deal and someone with a gun. Jurney lowered his weapon but did not put it back in the holster. Stoves opened the driver's side door and defendant ultimately exited the vehicle on his own. A .357 Magnum revolver was in a holster attached to his waist belt when defendant was searched. Jurney indicated that cannabis was also located, which he believed was found in the car, but he did not locate it personally. Jurney further testified that no other civilians were outside initially, but as the encounter progressed, individuals from the apartment complex came out, including a woman. Other officers who arrived during the search of defendant kept the uninvolved civilians at bay.

¶ 9     On cross-examination Officer Jurney acknowledged that Park City no longer had 911 service.

¶ 10    Commander Kenneth Stoves testified he arrived at the scene in an unmarked squad car, dressed in plain clothes but wearing a protective vest that identified him as a police officer. Prior to his arrival, Officer Jurney had advised, "observed a vehicle that was given a description through dispatch." Upon arrival Stoves testified he "observed the white vehicle that was described via dispatch." He and Officer Jurney walked up to the car, Jurney covering him from the side with his gun drawn. Stove did not recall if he initially drew his weapon, but said it was holstered when interacted with the defendant. The driver's window was open as he approached and Jurney called

to defendant to show his hands. Stoves smelled an order of cannabis coming from the vehicle. The officers had defendant exit the vehicle and he was searched. On defendant's person Stoves found a handgun in his waistband, a cellphone, and a cellophane package of cannabis in his pocket.

¶ 11    Dominisha Blake testified on behalf of defendant at the hearing. She and defendant smoked cannabis at her apartment the morning of January 30, 2018. As they exited the building together, they noticed a police car sitting at a stop sign. Defendant approached his white Audi and Blake stepped back to smoke a cigarette, "when [the police] all just start coming out of nowhere." Blake stated that the police had "guns drawn" and they were yelling: "Put your hands up, put your hands in the air, we got an anonymous call about somebody having a weapon[.]"

¶ 12    At the conclusion of the evidence, defendant argued that the anonymous tip was unreliable and uncorroborated such that the police lacked reasonable suspicion to conduct a *Terry* stop. In the alternative, if there was reasonable suspicion to justify a *Terry* stop, defendant contended the police exceeded the permissible scope of a *Terry* stop and moved instead to an arrest without probable cause when they drew a gun and ordered him out of the car. The State countered that the anonymous tip was reliable and provided reasonable suspicion that defendant was engaged in a possible drug transaction where a gun had been displayed to warn off the caller. The State further argued that it was reasonable for the police to draw a weapon for their own protection.

¶ 13    In ruling on the motion, the court stated:

> "Back in January of this year around 10:55 in the morning[,] police received an anonymous call regarding two male blacks standing in front of a car in a suspicious—or suspecting there may be drug activity. The caller reported that one male black in a tan shirt displayed the butt of what he believed to be a gun. He did make that anonymous call to police. The police, Officer Jurney, along with his

supervisor reported to the area. Officer Jurney made it very clear, and I find it to be clear and unequivocal, certainly credible, that he had his weapon drawn and upon approach to the vehicle after his weapon was drawn[,] he detected the strong odor of alcohol. He also said that although there was a tip involving the license plate of a Mazda 6, there was not testimony, and the record is certainly silent, that the car that [defendant] was found to be in was the same or similar—it was certainly similar, but the same car that was the subject of a tip, nor was there any testimony that there were two individuals, simply one black in the seat of the car.

The law in my view is relatively straightforward in this area. Judging an anonymous tip, certainly my job, among others, is to evaluate the reliability of the tip and whether or not that in and of itself supported some type of investigative action, which I certainly feel even in an anonymous tip of this nature, even though it was not necessarily supported by all of the evidence that Jurney found, I think it certainly supported police responding to the scene. Certainly[,] in my view they could have, had they chosen to, conducted a brief investigatory stop. I find the evidence, though, is clear and unequivocal that they did not do that.

I think that in addition to the fact that the tip in my view lacked sufficient specificity to justify a warrantless arrest, it also in my view was insufficient to justify the conduct of Officer Jurney and his partner for the purposes of this proceeding. I don't think that what they did was in line with what was certainly appropriate, nor do I find that it was supported by any type of evidence that they found when they did come onto the scene. Certainly[,] the commander that was present corroborated Officer Jurney in his testimony.

> I think it was clear, unequivocal what occurred. I think that it was not based on appropriate facts to justify a warrantless arrest. I find that the defense's motion to quash arrest and suppress evidence in this case was well placed and it will and shall be granted."

¶ 14 The State filed a motion to reconsider, arguing that drawing a weapon while demanding defendant to show his hands was reasonable to ensure officer safety, and was not an arrest, given the reasonable suspicion that defendant had recently been involved in a possible drug deal and an aggravated assault with a firearm. The trial court denied the motion to reconsider and the State timely appeals.

¶ 15                            II. ANALYSIS

¶ 16    Both the fourth amendment and the Illinois Constitution of 1970 guarantee the right of individuals to be free from unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. The United States Supreme Court's landmark decision in *Terry v. Ohio,* 392 U.S. 1 (1968), held that a brief investigatory stop, even in the absence of probable cause, is reasonable and lawful under the fourth amendment when a totality of the circumstances reasonably lead the officer to conclude that criminal activity may be afoot and the subject is armed and dangerous. *Terry,* 392 U.S. at 30; see also *People v. Close,* 238 Ill.2d 497, 505-06 (2010) (recognizing that this court follows *Terry* and adheres to its standards when reviewing the propriety of investigatory stops under the Illinois Constitution).

¶ 17    Explaining why investigatory stops based solely on reasonable suspicion do not run afoul of the fourth amendment, the *Terry* court noted that it carefully had to balance the need of law enforcement officials to have some flexibility when investigating potential criminal activity with an individual citizen's fourth amendment rights to be protected against unreasonable police

interference. *Terry,* 392 U.S. at 10-12. Balancing these interests, the Court observed that the government has a general interest in effective crime prevention and detection and that this interest justifies "the recognition that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Terry,* 392 U.S. at 22.

¶ 18     In considering the propriety of the trial court's rulings on a motion to suppress evidence, we ordinarily apply a two-part standard of review. *People v. Eubanks*, 2019 IL 123525, ¶ 33. We will reverse the trial court's factual findings only if they are against the manifest weight of the evidence. A finding is against the manifest weight of the evidence where the opposite conclusion is apparent or the findings are unreasonable, arbitrary, or not based on the evidence. *People v. Lomax*, 2012 IL App (1st) 103016, ¶ 19. We then review *de novo* the trial court's ultimate ruling on whether the evidence should be suppressed. *Eubanks* at ¶ 33.

¶ 19                    A. Justification for the *Terry* Stop

¶ 20     We first examine whether, under the totality of the circumstances, the officers had reasonable suspicion to seize defendant based upon the information provided by the anonymous caller to the non-emergency line of the Park City police department. For while there is no question that reasonable suspicion for a *Terry* investigation would have existed if the caller had flagged down the officer, pointed at the vehicle with defendant inside it, and relayed the facts stated in the recorded call, our fact pattern is not so straightforward. Here we need to consider the reliability of the relayed facts in the context of an anonymous non-emergency call to the Park City police department.

¶ 21     A police officer "may initiate a *Terry* stop based on information provided by a third party." *People v. Shafer*, 372 Ill. App. 3d 1044, 1049 (2007). And this information may be received

through official police communications, including radio transmissions. *People v. Maxey*, 2011 IL App (1st) 100011, ¶ 54. However, the information must be reliable and allow "an officer to reasonably infer that a specific person was involved in criminal activity." *People v. Jackson*, 348 Ill. App. 3d 719, 729 (2004). See also *People v. Lampitok*, 207 Ill. 2d 231, 257 (2003). The tip must also "be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Florida v. J.L.*, 529 U.S. 266, 272 (2000). As we noted in *In re J.J.,* 183 Ill. App. 3d 381, 385-86 (1989), "tips may vary greatly in their value and reliability and one simple rule will not cover every situation. Where some tips, completely lacking in indicia of reliability, would warrant either no police response or require further investigation before a stop would be justified, other situations, such as when a victim of a crime seeks immediate police aid and describes his assailant or when a credible informant warns of a specific impending crime, would justify the police making an appropriate response."

¶ 22    A court must ultimately consider the quality and content of the information and how reliable the source. *People v. Lampitok*, 207 Ill. 2d 231, 257 (2003). Factors to consider include whether the officers' observations corroborate the tip, whether the tipster explains the basis for his knowledge of the tip, and whether the officers act immediately upon receiving the tip. *Id.* In considering these factors, we initially note that some of the trial court's factual findings at the time of its ruling were demonstrably incorrect, and we of course will defer to the record where this has occurred. See *People v. Lomax*, 2012 IL App (1st) 103016, ¶ 19 (a finding is against the manifest weight of the evidence when a different conclusion is apparent in the record). Specifically, the caller reported the plate number of a white Audi, not a Mazda 6; the caller indicated one of the two men had a tan jacket, not a tan shirt; and both officers smelled an odor of cannabis coming from the defendant's car, not alcohol.

¶ 23 The following facts are uncontroverted and underlie our determination that the trial court's initial conclusion was correct that the tip was reliable and provided reasonable suspicion for a *Terry* investigation. The anonymous caller to the non-emergency police line made it clear he personally observed two black men engaged in a suspicious hand-to-hand transaction in an older model white Audi on Knight Street in front of a Colonial Apartments building. When these individuals noticed him looking, one of the two men displayed a revolver with a black handle in his waist band, as if to warn the caller to mind his own business. The caller then said he saw the males walk into the apartment building in front of where the white Audi was parked, and that the car was still there. That the call was made contemporaneously to the events related is supported by the caller's initial question whether there were any officers in the vicinity of what he was reporting had happened, and his further statement that the men had walked into one of the buildings and the car was still present. The caller further took a picture of the license plate and provided the plate number to the dispatcher. The FoxComm dispatcher ends the call by telling the caller, "we're going to get an officer started, ok." When the officers arrived after the dispatch to the location provided by the caller, presumably a short time later, a black man with a tan jacket was located sitting in the white Audi.

¶ 24 In concluding that the above tip was reliable, we have considered the various cases cited by defendant, including *Florida v. J.L.*, 529 U.S. 266 (2000), which defendant argues shows that there was no basis for the instant *Terry* investigation, let alone a full-blown arrest as he characterizes the actions of the instant officers. In *J.L.*, police received an anonymous tip via telephone that a young black male wearing a plaid shirt was standing at a bus stop carrying a gun. There was no audio recording of the tip, and nothing was known about the informant. In addition, it was unknown how quickly after the tip the officers responded, though they did ultimately report

to the bus stop. There, they encountered a suspect matching the informant's description (black male/plaid shirt), and although the defendant did not make threatening movements and there was no visible gun, the officers had him place his hands up on the bus stop, frisked him, and seized a gun from the defendant's pocket. *Id.* at 268.

¶ 25    The Supreme Court held that the anonymous tip, without more, was insufficient to justify the *Terry* stop. *Id.*at 274; see also *People v. Henderson*, 2013 IL 114040, ¶ 30 (relying on *J.L.* in finding that a bare-bones tip from an anonymous citizen reporting a "possible gun" in a moving vehicle without any predictive information was insufficiently reliable). In ruling that the anonymous call did not give rise to reasonable suspicion, the Court noted several deficiencies. "The anonymous call concerning *J.L.* provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility." *J.L.*, 529 U.S. at 271. Further, "[a]ll the police had to go on *** was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L." *Id.* The problem was that the tip in *J.L.* did not "show that the tipster ha[d] knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person. Cf. 4 W. LaFave, Search and Seizure § 9.4(h), p. 213 (3d ed.1996) (distinguishing reliability as to identification, which is often important in other criminal law contexts, from reliability as to the likelihood of criminal activity, which is central in anonymous-tip cases)." *Id.* at 272.

¶ 26    The State distinguishes *J.L.,* and likens the instant fact pattern to the Supreme Court's more recent discussion of anonymous tips in *Navarette v. California*, 572 U.S. 393 (2014). There, a 911 caller reported that another car had run her off the road. *Id.* at 395. She provided the make, model,

license plate number, the mile marker, and the direction of travel. *Id.* at 395-97. About 15 minutes later, an officer saw the car and pulled it over. The court, assuming the 911 caller was anonymous, found that the details in the call provided evidence that the caller had firsthand knowledge of the incident, thereby distinguishing the case from *J.L. Id.*at 398 (explicit and detailed description of wrongdoing, along with statement that the event was observed first-hand, entitles tip to greater weight than might otherwise be the case) (citing *Illinois v. Gates*, 462 U.S. 213, 234 (1983)). The court also found reliability based on the officers' observation of the car, suggesting the tipster reported the incident contemporaneously with its occurrence. *Id.* at 399-400. Finally, the court found the tip reliable because the caller exposed herself to identification, and therefore accountability, by using the 911 system. *Id.* at 399-401. The *Terry* stop was approved, though the court acknowledged that it was a close case. *Id.* at 404.

¶ 27    The instant fact pattern is much closer to that of *Navarette* than *J.L.* As in *Naverette,* the caller used an official police phone line to report a crime where he was the victim, *i.e.*, aggravated assault. See 720 ICLS 5/12-2(c)(1)(aggravated assault is conduct reasonably placing another in apprehension of receiving a battery using a firearm). He provided the make of the vehicle associated with the crime, including its license plate, and exact location where the crime took place. Upon arriving at the scene after dispatch, the officers saw the car with defendant inside, and detained defendant for questioning. Though the caller was anonymous, details provided by the caller evidenced that the caller had firsthand knowledge of the incident which had just occurred. Also, the caller is reliable to the extent that the officers find the car and defendant where described, further suggesting the tipster reported the incident contemporaneously with its occurrence. *Id.* at 399-400.

¶ 28    We also find the *Naverette* court's discussion of the use of 911 calls helpful in assessing

the instant caller's reliability. Specifically, the Court noted that anonymous callers to 911 would be reluctant to provide false information that could subject them to prosecution given how modern technology makes it likely that such callers can be traced, and victims of false reports could listen to these recorded calls and identify callers making false reports for ulterior motives. *Id.* at 400-401; see also 720 ILCS 5/26-1(12) (West 2018) (a person may be convicted of disorderly conduct for making a false report to police). Accordingly, the Court indicated that the use of the 911 system was a fact that can be considered favorably in assessing the reliability of an informant. *Id.* While the instant caller used a non-emergency police number because Park City no longer used the 911 service, the call was routed to a FoxComm dispatcher. As with a traditional 911 call, it seems likely that the instant caller would have believed his recorded call could be traced and the caller identified. As in *Naverette,* though such a circumstance does not make the call *per se* reliable, it is relevant in a favorable sense in assessing the overall reliability of the caller. *Id.*

¶ 29    Nor do we find defendant's argument persuasive that because Illinois citizens may possess guns in public under certain circumstances, the possession of a gun as related by the anonymous caller should not factor into our reasonable suspicion analysis. While possession of a firearm is not necessarily a crime, and the officers were unaware of defendant's status as a felon or whether he possessed a valid Firearm Owner's Identification Card, or concealed carry license, his display of the weapon to the anonymous caller without provocation was potentially an aggravated assault in violation of 720 ILCS 5/12-2(c)(1)(West 2018). Further, as our supreme court noted in *People v. Colyar*, 2013 IL 111835, ¶ 49, requiring that police officers completely eliminate any legal explanation for a defendant's possession of a firearm in cases such as this ignores *Terry's* admonition that "a perfectly reasonable apprehension of danger may arise long before the officer is possessed of adequate information to justify taking a person into custody for the purpose of

prosecuting him for a crime."

¶ 30     For all the foregoing reasons, we find that the trial Court correctly concluded that the officers had reasonable suspicion to engage in a *Terry* stop.

¶ 31                              B. Scope of the Encounter

¶ 32     We next turn to the scope of the encounter and the trial court's determination that the initial display of a weapon and the command to show his hands exceeded the permissible scope of a *Terry* investigation, instead constituting a warrantless arrest without probable cause.  The State maintains that the court erred in so concluding because the surrounding circumstances gave rise to a justifiable fear for personal safety, such that the officers were allowed to draw a weapon and perform a weapons search of defendant as part of a *Terry* investigation.  Defendant counters that the Court was correct when it construed these acts as a warrantless arrest without probable cause. The State bears the burden of showing that an otherwise permissible seizure based on reasonable suspicion was sufficiently limited in scope and duration.  *People v. Brownlee,* 186 Ill. 2d 501, 519 (1999).

¶ 33     "The officer need not be absolutely certain that the individual is armed, the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."  *Id.*  Further, in assessing reasonableness, courts should remain cognizant that police are often required to make "split-second decisions, without the benefit of immediate hindsight" in situations that are often uncertain, tense, and rapidly evolving.  *People v. Lomax*, 2012 IL App (1st) 103016, ¶ 40.  Each case is governed by its own facts and circumstances. *Terry,* 392 U.S. at 27.

¶ 34     When the Supreme Court in *Terry* held that a brief investigatory stop, even in the absence of probable cause, is reasonable under the fourth amendment when a totality of the circumstances

leads an officer to conclude that criminal activity may be afoot and the subject is armed and dangerous, it also recognized a "more immediate" government interest in allowing a police officer to "take[e] steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him." *Terry,* 392 U.S. at 23. Because of the obvious threat posed to law enforcement officials during investigatory stops, the Court concluded:

> "[W]e cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest. When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact, carrying a weapon and to neutralize the threat of physical harm." *Id.* at 24.

Thus, the Court gave law enforcement officials "a narrowly drawn authority" to permit a reasonable search for weapons when the officer has reason to believe that the subject of his investigation is armed and dangerous. *Id.*

¶ 35    During a *Terry* stop, then, it is axiomatic that an officer may detain a suspect with a drawn gun without converting the stop into a full arrest so long as doing so is reasonable under the circumstances. Where reasonable to ensure officer safety or the safety of the public, such actions do not convert a *Terry* stop into a custodial arrest for fourth amendment purposes. See *People v. Leggions,* 382 Ill. App. 3d 1129, 1133 (2008)(investigatory stop not converted to arrest because officer draws gun); *People v. Culbertson*, 305 Ill. App. 3d 1015, 1024-1025 (1999) (fact that police approached vehicle with guns drawn did not convert the stop to an arrest); *People v. Schacht*, 233

Ill. App. 3d 271, 276 (1992) (police officers reasonably drew their weapons for their own individual safety when they stopped defendant's vehicle); *People v. Washington*, 205 Ill. App. 3d 452, 456 (1990)) (temporary detention and weapons search of defendant was valid *Terry* stop and did not constitute arrest, even though police approached defendants with guns drawn). Afterall, the difference between an arrest and a *Terry* stop is not the restraint on a person's movement but, rather, the length of time the person is detained and the scope of the investigation that follows the initial encounter. *People v. Fields*, 2014 IL App (1st) 130209, ¶ 26. In drawing the line, we must remember that police officers are not required to risk their safety by assuming that suspects will submit quietly to questioning. *People v. Starks*, 190 Ill. App. 3d 503, 509 (1989).

¶ 36    Both parties have cited a panoply of cases in support of their position, all of which we have reviewed. In the end, however, each case is governed by its own facts and circumstances. *Terry,* 392 U.S. at 27. We will not second guess the drawing of Officer Jurney's weapon to effectuate the brief detention and investigation in a case such as this. Here, the officers were not only investigating a possible drug transaction, but more compellingly, the display of a weapon to an innocent party which constituted a Class 4 felony, *i.e.*, aggravated assault (720 ILCS 5/12-2(c)(1)). We are also cognizant that "investigative detentions involving suspects in vehicles are especially fraught with danger to police officers." *Michigan v. Long*, 463 U.S. 1032, 1047 (1983).

¶ 37    Reasonable articulable suspicion, coupled with a concern over a weapon, gave the officers the right to approach the brief investigation with their safety in mind. The right to frisk for weapons includes the right to approach in such a manner as to not get shot. Here, the display of a gun and asking defendant to put his hands out of the car, followed by a search for weapons, did not constitute an arrest. Accordingly, we find the trial court erred in suppressing the evidence and quashing the arrest.

¶ 38                              III. CONCLUSION

¶ 39    For the reasons stated, the judgment of the circuit court of Lake County is reversed and the cause is remanded for further trial proceedings.

¶ 40    Reversed and remanded.